John F. McGONIGLE, Virginia M. McGonigle, Plaintiff–Appellant,

v.

Leslie COMBS, II, et al, Defendant–Appellee.

Robert D. STRATMORE, Plaintiff–Appellant,

v.

Leslie COMBS, II, et al, Defendant–Appellee.

Blas R. CASARES, Plaintiff–Appellant,

v.

Brownell COMBS, II, Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C., a Kentucky professional corporation; Frank L. Bryant; Robert J. McGuiness; Bateman Eichler, Hill Richards, Inc., a Delaware corporation; Garth Guy; Central Bank & Trust of Lexington, a Kentucky banking corporation, Defendants–Appellees,

and

Spendthrift Farm, Inc.; Leslie Combs, II, Defendants.

George E. LAYMAN and George E. Layman, Jr., d/b/a Forest Acres Partnership, a Washington General Partnership; Barry K. Schwartz and Calvin Klein, d/b/a Barry K. Schwartz Partnership, a New York general partnership; Earl H. Shultz; Kenneth Franzheim, II, Plaintiffs–Appellants,

v.

Brownell COMBS, II; Bateman Eichler, Hill Richards, Incorporated, a Delaware corporation; Robert J. McGuinness; Garth Guy; Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C., a Kentucky professional corporation; Frank L. Bryant, Defendants–Appellees.

Blas R. CASARES, Plaintiff–Appellant,

v.

SPENDTHRIFT FARM, INC.; Leslie Combs, II; Brownell Combs, II; Garth Guy; Charles R. Hembree; Kincaid,

Wilson, Schaeffer & Hembree, P.S.C., a Kentucky professional corporation; Frank L. Bryant; Robert J. McGuinness; Bateman Eichler, Hill Richards, Inc., a Delaware corporation, Defendants,

and

Central Bank & Trust of Lexington, a Kentucky banking corporation, Defendant–Appellee.

James H. GRIGGS, Plaintiff–Counter-defendant–Appellant,

v.

Brownell COMBS, II; Garth Guy; Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C., a Kentucky professional corporation; Frank L. Bryant; Robert J. McGuinness; Bateman Eichler, Hill Richards, Incorporated, a Delaware corporation, Defendants–Appellees,

Central Bank and Trust Co., a Kentucky banking corporation; Deloitte, Haskins & Sells, Defendants, Counter–claimants–Appellees.

Zenya YOSHIDA, d/b/a Shadai Farm, Plaintiff–Appellant,

v.

Brownell COMBS, II; Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C., a Kentucky professional corporation; Frank L. Bryant; Robert J. McGuinness; Bateman Eichler, Hill Richards, Inc., a Delaware corporation; Garth Guy, Defendants–Appellees.

HAMILTON PARTNERS, a Ohio general partnership; Frank E. Fowler; James P. Coleman; Mercer Reynolds, III; William O. DeWitt, Jr.; Northwood Thoroughbred Investors, a New York general partnership Northwood Ventures, a New York Limited partnership; Peter G. Schiff; Gateway Investment Partnership, an Ohio general partnership; Calvin Ingram, Plaintiffs–Appellants,

v.

Brownell COMBS, II; Garth Guy, Defendants–Appellees.

Richard L. SCHULTZ, Plaintiff–Appellant,

v.

Leslie COMBS, II, et al, Defendants,

and

Brownell Combs, II; Garth Guy; Bateman Eichler Hill Richards, Inc.; Robert J. McGuiness; Spendthrift Farm, Inc.; Central Bank & Trust of Lexington; Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C.; Frank L. Bryant, Defendants–Appellees.

Richard L. SCHULTZ, Plaintiff–Appellant,

v.

BATEMAN EICHLER HILL RICHARDS, INC.; Robert J. McGuiness; Charles R. Hembree; Kincaid, Wilson, Schaeffer & Hembree, P.S.C.; Frank L. Bryant, Defendants–Appellees.

Nos. 89–16584, 89–16586, 89–16588, 89–16602, 89–16605, 89–16608, 89–16611, 89–16615, 89–16619 and 89–16620.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 19, 1991.

Decided June 19, 1992.

See also 723 F.Supp. 458.

Richard M. Trautwein, Alagia, Day, Marshall, Mintmire & Chauvin, Louisville, Ky., for plaintiff-counter-defendant-appellee Blas R. Casares.

John I. Alioto, Michael J. Bettinger, Alioto & Alioto, San Francisco, Cal., for plaintiffs-counter-claim-defendants-appellees-appellants.

M. Laurence Popofsky, Michael L. Rugen, Heller, Ehrman, White & McAuliffe,

San Francisco, Cal., for defendants-appel-lees-appellants Charles R. Hembree and Kincaid, Wilson, Schaeffer & Hembree, P.S.C.

James E. Burns, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for defen-dants-appellants-appellees Bateman, Ei-chler, Hill Richards, Inc., and Robert J. McGuinnes.

Thomas K. Bourke, Riordan & McKinzie, Los Angeles, Cal., for defendant-counter-claimant-appellant-appellee Frank L. Bryant.

Neil A. Goteiner, Ann G. Daniels, Farel-la, Braun & Martel, San Francisco, Cal., for defendant-appellee Central Bank & Trust Co. of Lexington, Ky.

Curt H. Mueller, Cooley, Godward, Cas-tro, Huddleson & Tatum, San Francisco, Cal., for defendant-appellee Brownell Combs II.

Leslie G. Landau, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant-appellee Deloitte Haskins & Sells.

Before: CANBY and KOZINSKI, Circuit Judges and CARROLL*, District Judge.

CANBY, Circuit Judge:

This appeal arises out of a private place-ment of stock in Spendthrift Farms, Inc. ("Spendthrift") that occurred in 1983. Sev-eral investors sued the co-owners of Spend-thrift, Brownell Combs II ("Combs") and his father Leslie Combs II[1], as well as consultants, attorneys, an investment bank, an accounting firm, and a commercial bank. In summary judgment and directed verdict rulings, the district court dismissed all claims against the professional defen-dants—the attorneys, the investment bank, the accounting firm, and the commercial bank. Some of the claims against Combs

and his consultant, Garth Guy ("Guy"), were submitted to a jury, which returned a verdict for the defense. The plaintiffs ap-peal the district court's summary judgment and directed verdict rulings as well as the jury verdict, which they contend was based on erroneous instructions. We affirm.

## BACKGROUND

In the early 1980s, Spendthrift was the largest thoroughbred horse breeding opera-tion in the world. In 1983, Brownell and Leslie Combs, each of whom owned 50% of Spendthrift, employed Guy to assist them in selling a portion of their interests in Spendthrift. At Guy's suggestion, the Combses decided to sell $35 million worth of stock in Spendthrift in a private place-ment, to be followed by a public offering by Spendthrift.

In connection with the private placement, Combs and Guy utilized the services of Charles R. Hembree and Edwin L. Schaef-fer, both of whom were partners in Kin-caid, Wilson, Schaeffer & Hembree, P.S.C. ("Kincaid firm"), a Kentucky law firm. Guy drafted, and Hembree reviewed, the Private Placement Memorandum ("PPM") in March of 1983. Guy also contacted the Central Bank & Trust Company ("Central Bank"), which agreed to consider loan ap-plications from investors in the private placement. The PPM contained back-ground on Spendthrift as well as a balance sheet valuing Spendthrift's assets at over $114 million and financial statements pre-pared by Deloitte, Haskins & Sells ("De-loitte"). The PPM was released on April 1, 1983, and Guy began to solicit investors by June. At the same time that the private placement was proceeding, Guy and Combs engaged the services of Bateman Eichler, Hill Richards, Incorporated ("Bateman Ei-chler"), and in particular Robert J. McGui-ness, a stockbroker at Bateman Eichler, to serve as lead underwriter for the public offering, which was scheduled to occur a few months after the private offering was completed. Guy and the Combses also

---

* The Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation.

1. Leslie Combs reached a settlement agreement with the plaintiffs and thus is not a party to this litigation.

hired Frank Bryant as a financial consultant to Spendthrift in connection with the public offering.

After over 500 persons were contacted, 34 agreed to participate in the private placement for Spendthrift stock. Prior to purchasing shares, each of these investors signed a subscription agreement representing and warranting that he or she had carefully reviewed the PPM; that he or she had a net worth in excess of $5 million; that he or she possessed, either alone or with an investment advisor, sufficient knowledge and experience in financial and business matters to evaluate the risks of the investment; and that he or she understood that the investment in Spendthrift involved a substantial degree of financial risk. The private placement closing took place on August 4, 1983, with investors paying $7.50 per share (after a 4-for-3 stock split in September 1983). After the closing, work continued on the initial public offering, which closed on November 22, 1983. The public offering price was $12 per share, and the price per share remained above the level that the plaintiffs paid through 1984.[2] In 1985, the price of the Spendthrift stock declined dramatically. In February 1986, plaintiffs began filing the complaints that were consolidated in this litigation.

Nine actions were consolidated before Judge Charles A. Legge for pretrial and trial purposes. The plaintiffs, all of whom were investors in the private placement, alleged, inter alia, violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (1991), common law claims of fraudulent misrepresentation and negligent misrepresentation, and violations of Washington and Kentucky Blue sky laws.

In December 1988, the district court dismissed all plaintiffs' claims against four defendants: Central Bank, Bryant, Bateman Eichler, and McGuiness. The remaining defendants then moved for summary judgment on the alleged misrepresentations and omissions claimed by the plaintiffs. The district court ruled that dozens of the alleged misrepresentations and omissions were, as a matter of law, not actionable, and granted summary judgment on those claims. Trial proceeded on the remaining misrepresentation or omission claims against Hembree, the Kincaid firm, Combs and Guy. After plaintiffs completed their evidence on liability issues, the district court entered a directed verdict on behalf of Hembree and the Kincaid firm on all claims. The district court also directed a verdict in favor of Combs and Guy on certain claims, and ruled that some of the alleged misrepresentations and omissions that had survived summary adjudication were not actionable and would not be submitted to the jury. Claims against Combs and Guy were submitted to the jury for violation of Rule 10b-5, violation of the state securities statutes of Kentucky and Washington, and for common law fraud and negligent misrepresentation. The jury returned a verdict in favor of Combs and Guy on all claims.

On appeal, plaintiffs contend that: 1) the district court improperly withheld from the jury three misrepresentations that allegedly violated Rule 10b-5 and constituted both fraud and negligent misrepresentation; 2) the district court misconstrued the loss causation requirement of Rule 10b-5 and therefore erred both in entering a directed verdict for the defendants on four alleged omissions and in giving improper instructions on three alleged misrepresentations that did go to the jury;[3] 3) the

**2.** The plaintiffs could not realize this profit by selling their stock because trading in private placement stock is restricted for two years from the date of purchase. SEC General Rules and Regulations, 17 C.F.R. 230.144 (1991).

**3.** The plaintiffs also challenge the district court's dismissal of other Rule 10b-5 claims against the professional defendants (Hembree, the Kincaid firm, Bateman Eichler, McGuiness, Bryant, De-

loitte, and Central Bank). They argue that certain interactions between plaintiffs and defendants involved misrepresentations in violation of Rule 10b-5 because, contrary to the district court's ruling, there was evidence of scienter, materiality and reliance. Plaintiffs do not contend, however, that any of the alleged misrepresentations satisfy our loss causation requirement under Rule 10b-5. Moreover, there is no

district court erred in dismissing some of plaintiffs' fraud and negligent misrepresentation claims; 4) the district misconstrued both Washington and Kentucky Blue sky laws.[4]

## ANALYSIS

### I. THE THREE REPRESENTATIONS THAT ALLEGEDLY VIOLATED RULE 10b–5 AND CONSTITUTED FRAUD AND NEGLIGENT MISREPRESENTATION

■ The district court granted a directed verdict for the defendants on three alleged misrepresentations in the PPM, concluding that they were not actionable. The plaintiffs appeal the district court's ruling, arguing that they should have been allowed to present their claims to the jury as violations of Rule 10b–5 and as a basis for pendent fraudulent misrepresentation and negligent misrepresentation claims. We review a directed verdict under the same standard applied by the district court; a directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict. *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

### A. *The Allegedly Misleading Comparison of Spendthrift with Other Horse Breeding Companies*

The plaintiffs' first challenge to the directed verdicts relates to an allegedly misleading comparison between Spendthrift and three publicly-traded horse breeding companies. The PPM contained a chart listing three other horse breeding companies, all of which had had a public offering. The chart indicated that each of them was

trading at a market value that was higher than the companies' latest published book value, and that the average premium was 321%. Below the chart, the PPM had a brief discussion of the other companies that included the following statement: "Assuming that Spendthrift were valued as highly by the public as [the three publicly traded companies], the current public market value would be 421 percent of the equity, or in excess of $383,000,000."[5] The plaintiffs object to this statement because the 321% "premium over equity" for the three public companies was the average ratio between the companies' market value and their *book value,* whereas the $383 million market value suggested for Spendthrift constituted a 321% premium over Spendthrift's *appraised fair market value.* The relevance of this distinction is that the appraised value of Spendthrift was significantly higher than its book value. The plaintiffs claim—and the defendants do not dispute—that 421% of the book value of Spendthrift was only about $45 million. The result, according to the plaintiffs, was that the PPM contained a misleading comparison that inflated the value of Spendthrift and induced them to buy the stock.

■ The problem with the plaintiffs' argument is that the PPM contained a number of disclaimers in the paragraph immediately after the statement regarding the other companies:

While the management of Spendthrift believes that the current values are extremely high, they do represent the market as it exists today in these companies. This means that a 35 percent interest in Spendthrift, should Spendthrift be valued at the same premiums as the companies listed above, would be worth $134,000,-

---

basis for such a claim, because none of the alleged misrepresentations arising from the interactions had any impact on the value of plaintiffs' investment in Spendthrift. Because the plaintiffs' allegations against the professional defendants do not include facts sufficient to satisfy the loss causation element of Rule 10b–5, these claims fail.

**4.** Only plaintiff Layman alleged a violation of Washington Blue sky laws. The Kentucky Blue sky claim was raised by plaintiff Casares, who

also challenged the court's dismissal, on statute of limitations grounds, of his claims under Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5. Because we hold that the court correctly dismissed the 10(b) and Rule 10b–5 claims on loss causation grounds, we do not consider Casares' claim that the judge erred in ruling that his claims were barred by the statute of limitations.

**5.** 421% is the total of the actual equity (100%) and the premium in the public market (321%).

000 in today's market. It should be emphasized that this does not represent an estimate by Management of the value of Spendthrift, nor does it represent what Management feels that Spendthrift would be worth if it went public today, nor should any investor take comfort that these values in any way represent the worth of Spendthrift. Management is saying that the values that are represented in the tables [outlined above] are, to the best of its knowledge, an actuality. As can be seen [above], International Thoroughbred Breeders [one of the three companies in the chart] has a total market value of $98,000,000 as of March 1, 1983. The total value that the sellers are placing on Spendthrift Farm, Inc. for the purpose of this placement is $100,000,-000.

The district court relied on these disclaimers in dismissing the claim of misrepresentation:

I don't think there's really anything that is a misrepresentation of fact in here at all. It seems to me it's a cute exercise in mathematics, but I think page 103 [containing the chart and the paragraphs quoted above] particularly is riddled with disclosures particularly that last paragraph that a reader is not to rely upon this and that the value of $100 million is stated and not the multiplied values that are presented up.above.

We agree with the district court that no rational jury could find the comparative figures to have been material in light of their openly hypothetical nature and the specific disclaimers. A fact is material if there is " 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.' " *Grigsby v. CMI Corp.,* 765 F.2d 1369, 1373 (9th Cir.1985) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *see also SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982); *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 964 (9th Cir.1990). The investors here were by no means neophytes or persons otherwise unacquainted with business and financial affairs. The district court was entitled to take that fact into account in determining whether a reasonable shareholder in their position would consider the comparison figures significant. *See Hughes v. Dempsey–Tegeler & Co.,* 534 F.2d 156, 177 (9th Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976).

Even if the comparison was one between apples and oranges, as plaintiffs claim, the PPM made clear that the multiples were derived from the book values of the other companies and from the appraised value of Spendthrift. At worst, the only effect of this flaw was to produce an inflated hypothetical figure of $383 million at which the public *might* come to value Spendthrift. The PPM expressly disavowed that figure as a statement of the value of Spendthrift and advised investors not to rely on it. The PPM valued the enterprise instead at $100 million for purposes of the private placement. The district court did not err in concluding that no rational jury could find that reasonable investors in plaintiffs' positions could have relied on the $383 million figure.

■ The lack of materiality of the comparison defeats the claims under section 10(b) and Rule 10b–5. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981) (for a 10b–5 claim, plaintiff must establish "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury."), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). It also defeats the fraud and negligent misrepresentation claims, because justifiable reliance is an element of both of those claims under California law. *See Continental Airlines v. McDonnell Douglas,* 216 Cal.App.3d 388, 264 Cal.Rptr. 779, 784 (1989); *Cicone v. URS Corp.,* 183 Cal.App.3d 194, 227 Cal. Rptr. 887, 890 (1986); B.E. Witkin, *California Procedure,* Pleadings § 666 (3rd ed. 1985); *see also Smolen,* 921 F.2d at 964. The district court accordingly did not err in

ruling that the comparison was not actionable.

### B. *The Allegedly Improper Treatment of Privileges to Breed on the Income Statement*

The second alleged misrepresentation involves privileges to breed ("PTBs"), which are breeding rights in a stallion that has been syndicated. After two weeks of trial, the plaintiffs attempted to introduce evidence that it was improper for Spendthrift both to recognize income upon requisition of a PTB and to recognize income each year when the PTB produces actual revenues. The district court ruled that the plaintiffs were precluded from introducing evidence on this alleged misrepresentation, because they failed to identify that issue in the list of alleged misrepresentations that they were required to file as part of the pretrial proceedings.

■ The plaintiffs contend that the judge abused his discretion[6] in so ruling, because, first, the pretrial list of alleged misrepresentations was "an informal road map," and, second, the plaintiffs raised the issue in their pretrial list. Neither of these contentions has merit.

■ With respect to plaintiffs' first argument, the record reveals that the pretrial order was intended to produce a complete list of alleged misrepresentations. The genesis of the list was a request by the defendants shortly before the trial (but after considerable discovery) that the plaintiffs identify all of the alleged misrepresentations, so that the defendants could challenge the legal sufficiency of each of them. In response to this request, the district court issued a conference order which required that "Plaintiff shall serve and file by Friday, October 21, 1988, a list of each alleged misrepresentation or misleading omission of material fact which they assert defendants have made." Nothing in the conference order suggests any informality regarding the list. The court's apparent intention was to give the defendants notice of all the alleged misrepresentations, and to that end it required the plaintiffs to identify each of their claimed misrepresentations and omissions. Allowing the plaintiffs to introduce a new claim of misrepresentation would have defeated the purpose of the order. The court properly ruled, therefore, that the order did not permit the plaintiffs to present evidence of a newly discovered alleged misrepresentation at trial.

Plaintiffs' second argument also does not withstand scrutiny. Plaintiffs contend that two of the entries on the list of alleged misrepresentations encompass their PTB claim. First, they point to their claim that "the appraisal based financial statements in the PPM were false and misleading in including contingent privileges-to-breed in Spendthrift's balance sheet." This assertion is an attack on the balance sheet, on the theory that it should not have included contingent assets and that PTBs were contingent. This issue, which the district court did permit the plaintiffs to present, is entirely different from the question of whether or not the *income statement* should have recognized income from both the receipt and the sale of a PTB. The two claims are wholly independent of each other. The district court correctly ruled, therefore, that this entry on the list of alleged misrepresentations did not raise the issue of the PTBs' treatment on the income statement.

The second entry on the pretrial list that plaintiffs identify as including their claim about PTBs on the income statement is their assertion that "[t]he PPM misrepresented that the income statements included in [the] PPM were prepared in accordance with generally accepted accounting principles." This statement, however, is so general that it cannot be construed as presenting plaintiffs' claims about the PTBs on the income statement. As the district court stated, "there's really no identification in that [entry] of any specific points that they're pointing out, and I just don't think

---

**6.** Evidentiary rulings are not reversible absent clear abuse of discretion. *Jauregui v. City of*

*Glendale,* 852 F.2d 1128, 1132 (9th Cir.1988).

you can use a catch-all like that to save an issue." Indeed, a holding that this general statement encompasses the PTB claim would frustrate the purpose of the list of alleged misrepresentations, as it would allow the plaintiffs to present a claim of which the defendants had no reasonable notice. We conclude, therefore, that the trial judge correctly prevented the plaintiffs from raising the PTB claim at trial.

### C. Alleged Improprieties in the Valuation of Spendthrift Broodmares

The third alleged misrepresentation arises out of the PPM's inclusion of an appraisal of Spendthrift's broodmares by Richard Broadbent.[7] Spendthrift had purchased 44 of the broodmares in the six months preceding the final appraisal, but Broadbent appraised them at values 32 percent higher than the purchase price. One of the bases for the increased valuations, as both plaintiffs and defendants agree, was that Spendthrift planned to breed the mares to stallions of a higher quality than previous owners had provided when breeding these mares. The plaintiffs argue that this higher valuation constitutes a violation of Rule 10b–5 because the basis for the increase—the assumption about breeding the mares with superior stallions—was not disclosed, and instead Broadbent's appraisal letter (included as an appendix to the PPM) stated that the mares were valued at their "worth at this time."

■ The plaintiffs' 10b–5 claim fails for two reasons. First, plaintiffs failed to show that the appraisal was faulty or misleading. Plaintiffs' expert acknowledged that "underbreeding" mares to inferior stallions could produce a low valuation of the mares, and that there are no industry standards that could serve as a basis for an attack on Broadbent's methodology. Second, plaintiffs failed to show that the defendants had anything to do with the method of appraisal, or had knowledge of any alleged improprieties or inaccuracies in the

independent appraiser's product. Scienter is a requisite element of a 10b–5 claim. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The plaintiffs' failure to establish falsity of the appraisal or scienter also defeats their claims of negligent misrepresentation and fraud. One element of a misrepresentation claim is that "[t]he misrepresentation must have been untrue." Continental Airlines, 264 Cal.Rptr. at 784. Similarly, an essential element of fraud is "knowledge of falsity (scienter)." Molko v. Holy Spirit Ass'n, 46 Cal.3d 1092, 252 Cal.Rptr. 122, 129, 762 P.2d 46, 53 (1988), cert. denied, 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989); Semore v. Pool, 217 Cal.App.3d 1087, 266 Cal.Rptr. 280, 289 (1990).

### II. THE FOUR ALLEGED OMISSIONS DISMISSED BY THE DISTRICT COURT ON CAUSATION GROUNDS

■ The plaintiffs' second contention is that the district court erred when it dismissed, on causation grounds, Rule 10b–5 claims based on four alleged omissions. The alleged omissions are that the defendants concealed: A) the $4.2 million "commission" paid to Guy for his role in the private placement; B) the "no-risk" deals given to certain investors; C) Gibson, Dunn & Crutcher's advice to delay the closing of the private placement; and D) the large number of potential investors who were contacted. The district court, in granting a directed verdict on these alleged omissions, stated:

> The plaintiff must also establish loss causation, and that means that the misrepresentations and omissions have to have caused the harm, that is, they have to have impacted the value of the investment.

The plaintiffs do not appear to argue that the four facts allegedly omitted did, in fact, diminish the value of their investment.[8]

---

7. Plaintiffs do not present any claims on appeal against Broadbent, as they reached a settlement agreement with him before the trial.

8. Even if plaintiffs' brief can be construed as raising such a contention, there is no merit to it.
   First, the $4.2 million payment to Guy came from Leslie and Brownell Combs personally, not from Spendthrift Farms. Thus the payment

Instead, they argue that the district court mistakenly assumed that loss causation requires that omissions contribute to a decline in value.[9] The plaintiffs contend that loss causation only requires them to show that the defendants' alleged omissions of material facts related to the "quality" of the investment and induced the investors' purchases. We reject the plaintiffs' arguments and hold that the plaintiffs failed to satisfy the loss causation requirement for Rule 10b–5 cases because they did not show that the existence of the allegedly omitted facts reduced the proper valuation of their investment.

We outlined the two components of the causation requirement in Rule 10b–5 cases in *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir.1984): "[I]n an action brought under Rule 10b–5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm."[10] *Accord Securities Investor Protection Corp. v. Vigman*, 908 F.2d 1461, 1467 (9th Cir.1990), *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). We further delineated loss causation in *Vig-*

---

to Guy, like all other payments made by the Combs from their personal funds, had no relation to the value of the stock that the plaintiffs purchased.

With respect to the second alleged omission, even if it is assumed that certain investors were given "no-risk" deals (a contention disputed by the defendants), such deals could not have had an impact on the value of the Spendthrift stock. Under the "no-risk" deals, some investors received loan guarantees from Combs, and another, Bryant, entered into a stock repurchase agreement with Combs in lieu of fixed compensation. Such arrangements, like the $4.2 million payment to Guy, involved payments from Combs personally. Thus, Combs' involvement in such deals was a personal financial matter that had no relevance to the proper valuation of the Spendthrift stock.

The third alleged omission—failure to disclose the Gibson firm's advice to delay the closing of the private placement—also is irrelevant to the valuation of the Spendthrift stock. The Gibson firm never suggested that there were legal problems with the private placement (and no federal or state authorities have ever questioned the validity of the Spendthrift private placement or its compliance with the applicable securities laws). The Gibson firm's statement was that it needed more time before it could give the underwriters of the *public* offering a legal opinion. The Combs' decision to proceed with the private placement did not prevent this compliance work. Thus the Gibson firm's statement had no effect on the legality of the private placement, nor did it have any impact on the value of the Spendthrift stock.

The fourth and final alleged omission, that the defendants concealed their solicitation of over 500 investors, clearly had no effect on the value of the Spendthrift stock. The many contacts may indicate that the Spendthrift private placement was not the exclusive deal that the plaintiffs had supposed, but those contacts did not reduce the proper valuation of the Spendthrift stock.

**9.** The plaintiffs make a similar argument with respect to the three Rule 10b–5 claims that did go to the jury. Those claims were: first, that the PPM falsely represented that the profit and loss statement was prepared using generally accepted accounting principles; second, that the PPM misrepresented the accounting of privileges to breed; and third, that the historical equity growth table in the PPM was misleading. With regard to those claims, the district court gave the following instruction on loss causation:

> Each plaintiff must show that except for the misrepresentation or omission the loss would not have occurred, and the loss was either a direct result or a reasonably foreseeable result of the misleading statements or omissions. It is not enough for the plaintiffs to show that but for the misrepresentations or concealments they would not have made their investments. The plaintiffs must show that the difference in this value of their investment was connected to and a result of the misrepresentations or concealments of the defendants, and not from some other cause or causes. In other words, each plaintiff must prove not only that the misrepresentations or concealments caused him to make his purchase, but also that they were the reasons why the value of the stock turned out to be less than the plaintiff thought it was going to be.

The plaintiffs contend that this instruction was erroneous because, like the district court's dismissal of the other alleged misrepresentations, it required that the misrepresentations cause a reduction in the value of the investment. Because the issues raised by the instruction are identical to those raised by the directed verdict, our holding with respect to the directed verdict also applies to the instruction. We accordingly reject the plaintiffs' jury instruction claim.

**10.** Some courts refer to transaction causation as "reliance" and refer to loss causation simply as "causation," but this distinction is merely semantic. *See, e.g., Huddleston,* 640 F.2d at 547–49.

*man,* holding that the plaintiffs "must establish a causal connection between the alleged predicate acts of securities fraud and the losses they seek to recover." *Id.* at 1468.[11]

Plaintiffs would have us interpret the "causal connection" requirement of *Vigman* very broadly. They argue that their loss was "caused" by the misrepresentations simply because the misrepresentations of the "quality" of their investment induced them to buy the shares which then declined in value. The misrepresentations, they argue, caused the loss because the loss would not have occurred if the misrepresentations had not been made. We reject this interpretation, because it renders the concept of loss causation meaningless by collapsing it into transaction causation. The dual and independent requirements of transaction causation and loss causation, as we noted in *Vigman,* are analogous to the basic tort principle that a plaintiff must demonstrate both "but for" and proximate causation. *Id.* at 1467–68. As the Fifth Circuit stated in *Huddleston,* 640 F.2d at 549, "[t]he plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value." *See also Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685–86 (7th Cir.), *cert. denied,* 496 U.S.

906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990) (plaintiffs must demonstrate that misrepresentation caused loss in order to establish liability under Rule 10b–5). Application of these principles here leads us to the conclusion that the plaintiffs were required to show that the alleged omissions adversely affected the objective value of their investment in Spendthrift, causing the loss for which they seek to recover.[12]

The plaintiffs also contend that, even if they were required to establish that the alleged omissions affected their investment, the judge erred in requiring that the *value* be diminished, but rather should have permitted them to show that the omissions affected the *quality* of the investment. In the context of this case, we have considerable difficulty understanding how an adverse effect on the quality of plaintiffs' investments could be manifested other than by a decline in value of their shares. It is true that, in other circumstances, an economic loss can sometimes be caused by a misrepresentation that did not affect the value of the stock purchased. One such instance occurred in *Hatrock,* where the claim was based on churning. The losses that were caused by the misrepresentation were the unnecessary trading commissions; there was no claim that the stocks purchased were of less value than represented. *Hatrock,* 750 F.2d at 773. *Hatrock's* result is limited to those facts. *See Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1486 n. 7 (9th Cir.1991). Another instance is *Manufacturers Hanover*

---

**11.** We did not reach the issue of loss causation in *Hatrock* because that was a "churning" case, in which the defendant's liability arose from the fact that he had recommended purchases in order to generate commissions, not because he had induced the plaintiffs to pay more than the stocks were worth. "The plaintiff ... should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security." *Id.* at 773.

**12.** Nothing in our recent decision in *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478 (9th Cir. 1991), weakens our circuit's requirement of loss causation. There we dealt with a fraudulent scheme to market overvalued diamonds. We upheld a complaint against a trust company and bank employed by the issuer, because the com-

plaint alleged that statements made by each institution contributed to the purchasers' belief that the diamonds were worth more than they were. The overvaluation was the cause of the loss. We stated that loss causation was sufficiently alleged when "the damages allegedly suffered by [plaintiff] were at least 'a reasonably foreseeable result of the misleading statement.'" *Id.* at 1487 (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)). That statement represents no change in our law; the element of foreseeability does not detract from the requirement that the loss be the "result" of the misrepresentation. *Levine* clearly set forth the requirement of loss causation, *id.* at 1485–86, and relied, as do we, on *Hatrock's* formulation of that standard. *Id.* at 1486 n. 7.

*Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). There a seller sold government securities with an agreement ("repo") to repurchase them at a later date. An auditor's report vastly overstated the seller's net worth. The court ruled that the purchasers had met the loss causation requirement, because the quality of the "repo" had been affected by the misrepresentation even though the value of the underlying government securities had not been affected. There can be little doubt, however, that the value of the "repo" itself was diminished.[13] Plaintiffs can point to no comparable diminution of value caused by the alleged omissions in the present case. The district court accordingly did not err in directing the verdicts.

## III. PLAINTIFFS' PENDENT NEGLIGENT MISREPRESENTATION CLAIMS

The plaintiffs contend that the district court erred by limiting the negligent misrepresentation claims to those arising from the four alleged omissions in the PPM discussed above (i.e., the alleged commission to Guy, the "no-risk" deals, the Gibson firm's request for delay, and the contact with over 500 investors).[14] The plaintiffs request a new trial so that they can present negligent misrepresentation claims arising out of various conversations between the plaintiffs and certain defendants. They furnish us with little or no explanation why particular statements might have constituted negligent misrepresentations, or why the district court might have erred in ruling the claims deficient. Except to say that we find no support for the claims in the portions of the record cited to us, we are unable further to deal with plaintiffs' contentions. *See Kopczynski v. The Jacqueline,* 742 F.2d 555, 560 (9th Cir.1984) (mere contention that jury instructions were "inadequate" does not provide basis for appellate review), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); *cf. In re Riverside–Linden Inv. Co.,* 945 F.2d 320, 324–25 (9th Cir.1991) (bare statement in appellee's brief that party was not entitled to interest insufficient to raise issue omitted from appellant's brief).

## IV. PLAINTIFFS' PENDENT FRAUDULENT MISREPRESENTATION CLAIMS

█ The plaintiffs argue that the jury instruction on their fraud claim was improper because it did not include an instruction on their claim of constructive fraud. The plaintiffs, however, failed to allege a constructive fraud claim in their amended complaint; their pleadings only contained a claim of fraudulent misrepresentation. Under California law, constructive fraud and fraudulent misrepresentation are different claims with different elements. *See* B.E. Witkin, *California Procedure,* Pleadings § 666 (3rd ed. 1985). Plaintiffs' suggestion that their fraudulent misrepresentation claim includes a claim of constructive fraud is, therefore, unavailing. Having failed to allege constructive fraud, plaintiffs cannot complain that the district court refused to instruct the jury on this claim.[15]

## V. WASHINGTON BLUE SKY CLAIMS [16]

### A. *Washington's Registration Requirements*

█ Plaintiff Layman's first claim under the Washington blue sky laws is that

---

**13.** To the extent that *Drysdale* can be read as not requiring a diminution in value at all, we reject its ruling as inconsistent with our circuit's requirement of loss causation.

**14.** The jury considered whether the alleged omissions constituted negligent misrepresentations and returned a complete defense verdict. The plaintiffs do not challenge these jury instructions or the jury's verdict.

**15.** The plaintiffs also assert that the district court improperly dismissed the constructive fraud claim against the professional defendants. Our conclusion that the plaintiffs failed to allege a constructive fraud claim in their complaint similarly resolves this issue in favor of these defendants.

**16.** Only plaintiff Layman brought claims under the Washington blue sky laws.

the district court misconstrued Washington law in ruling that the defendants were not required to register the Spendthrift stock sale. The applicable statute, Wash.Rev. Code § 21.20.320(1) (1989 & Supp.1991) exempts from registration requirements "[a]ny isolated transaction, or sales not involving a public offering, whether effected through a broker-dealer or not." The district court, relying on the language of the statute and on the testimony of a witness for the defendants who is a securities lawyer in Washington, ruled that the Spendthrift private offering was a "sale[ ] not involving a public offering" within the terms of the exemption provided in Section 21.20.320(1).

Plaintiff Layman argues that the statutory exemption is available only to issuers of securities, and that none of the defendants was an issuer of Spendthrift stock. This argument is not supported in the text of the statute, which does not explicitly confine its protections to issuers. The only support that Layman offers for his interpretation is a regulation that applies to a different section of the statute. Thus, Layman has produced no authority for his assertion that the exemption is limited to issuers of stock and has given us no reason to read such a limitation into the Washington blue sky laws. We conclude, therefore, that the district court did not err in ruling that Washington law exempts the defendants from its registration requirements.

### B. *The Inclusion of Proximate Causation in the Jury Instruction*

Layman's main blue sky claim (alleging fraud and material misrepresentation) was submitted to the jury, which returned a verdict for the defense. Layman challenges the district court's instruction to the jury on the ground that it improperly included the requirement that "the misrepresentation or omission was the proximate cause of Mr. Layman's claimed loss." Layman argues that this instruction was incorrect in light of *Hines v. Data Line Systems, Inc.*, 114 Wash.2d 127, 787 P.2d 8, 13 (1990), which states that proximate causation is not an element under the applicable section of the Washington blue sky laws.

Defendants do not dispute Layman's contention that the district court's instruction was erroneous, but rather argue that Layman waived this claim by failing to object to the jury instruction.

Rule 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. We have interpreted this rule strictly and have stated that, "[i]n a civil case, we may not review a jury instruction in the absence of a proper objection." *Larez v. City of Los Angeles*, 946 F.2d 630, 638 (9th Cir.1991); *see also Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir.) (plurality opinion) (en banc) (no appellate review of unobjected-to instructions even in cases of plain error), *cert. denied,* — U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 607 (1991).

We have acknowledged a limited exception to our strict interpretation of Rule 51, however. Where the district court is aware of a party's concerns with an instruction, and further objection would be unavailing, we will not require a futile formal objection. *Brett v. Hotel, Motel, Restaurant, Construction Camp Employees & Bartenders Union, Local 879*, 828 F.2d 1409, 1414 n. 7 (9th Cir.1987); *see Brown v. Avemco Inv. Corp.*, 603 F.2d 1367, 1373 (9th Cir.1979). Layman contends that his challenge to the requirement of proximate causation was preserved by two events at trial. First, he offered an instruction, which was rejected by the court, that omitted a requirement of proximate causation under Washington law. Second, in inquiring whether there were any objections to the court's instructions, the district court stated: "[To] the extent of your already submitted things that I have modified or rejected you need not restate them at this time. Your record is fully preserved with respect to all of the instructions that you submitted."

We cannot agree that these two events sufficed to preserve Layman's point for

appeal. It is true that Layman's proposed instruction omitted the requirement of proximate cause, but it did not state affirmatively that there was no such requirement. Instead, the relevant portion of the instruction spoke only of the requirement of reliance: "The reliance requirement under Washington law is quite similar to the reliance requirement under federal securities law. That is, Mr. Layman must show that his decision to invest was affected by a material misrepresentation."

The issue that clearly *was* preserved was the refusal of the district court to give this proffered instruction. If, as Layman argues, this instruction is sufficient to assert the point that there is no requirement of proximate causation under Washington law, then the instruction equally states the incorrect proposition that there is no loss causation (but only a transaction causation) requirement under federal law. "There is no error in a refusal to give incorrect or misleading instructions." *Mitchell v. Keith*, 752 F.2d 385, 388 (9th Cir.), *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985).

Nor is the proposed instruction sufficient to serve in lieu of an objection to the instruction that the district court did give, requiring proximate causation. Layman's proposed instruction made no affirmative statement that proximate causation was not required by Washington law, and Layman made no statement to that effect when given the chance to object to the district court's instructions. Most important, Layman never argued that Washington's requirements differed from, or were more lenient than, those of federal law. On the contrary, he took the position that the federal and state laws were similar in requiring only transaction causation. The district court correctly rejected his position on federal law. The issue of causation under Washington law was never raised as an independent issue.

Under these circumstances, we cannot conclude that Layman brought "into focus the precise nature of the alleged error" in the district court's instruction. *See Palmer v. Hoffman*, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943). "Rule 51 was designed to prevent unnecessary new trials caused by errors in instructions that the district court could have corrected if they had been brought to its attention at the proper time." *Robinson v. Heilman*, 563 F.2d 1304, 1306 (9th Cir.1977). Layman attempts to assert on this appeal precisely that kind of error.

Layman's position is certainly no better than that of the appellants in *Grosvenor Properties Ltd. v. Southmark Corp.*, 896 F.2d 1149 (9th Cir.1990). In *Grosvenor*, the appellants submitted a proposed jury instruction that was rejected by the district court, and the district court told counsel at a side bar conference on the instructions that it was not necessary for them to repeat previously submitted instructions or objections. Moreover, the appellants in *Grosvenor*, unlike Layman, called attention to the judge's refusal to give their instruction. We ruled that, despite the district court's statements and the fact that the appellants pointed out their alternative instruction, "this sequence of events is not sufficient to constitute a sufficient objection to the instructions that were given, as Rule 51 is applied in this circuit." *Id.* at 1152.

The principle established in *Grosvenor* is fully applicable to this case. We accordingly decline to entertain Layman's challenge to the district court's proximate cause instruction on the Washington blue sky claim.[17]

---

17. Layman presents an additional Washington Blue sky claim that relies on Wash.Rev.Code § 21.20.430(1) (1989), which provides that a seller who violates the fraud or registration provisions of the Blue sky laws must pay damages to the aggrieved buyer. This section does not present an independent basis for holding the defendants liable to Layman. In order for us to find that the district court erred in dismissing Layman's claim under this section, we would first have to find error in the district court's treatment of the fraud claim or the registration claim. Because we reject both the plaintiff's challenge to the jury instruction on his fraud claim and his challenge to the directed verdict on the registration claim, there is no basis for any recovery under this section.

## VI. KENTUCKY BLUE SKY CLAIMS [18]

### A. *Kentucky's Registration Requirements*

Plaintiff Casares challenges the district court's ruling that the defendants were exempt from complying with Kentucky's registration requirements by virtue of Kentucky officials' approval of the private offering. The section at issue, Ky.Rev.Stat. Ann. § 292.410(1)(q) (Michie Bobbs–Merrill 1990), provides that the registration requirements do not apply to "[a]ny transaction for which the director by rule or order finds that registration is not necessary or appropriate in the public interest or for the protection of investors." No formal requirements are set forth for an "order."

Casares presents two arguments: first, that the district court improperly admitted evidence indicating that the Director of Securities granted an exemption; second, that any exemption granted by the Director of Securities was outside the scope of the relevant regulations and, therefore, exceeded her authority.

■ Casares' first contention is a challenge to an evidentiary ruling of the district court, which we review for abuse of discretion. *Jaregui v. City of Glendale,* 852 F.2d 1128, 1132 (9th Cir.1988). The evidence at issue was a file memorandum written by Lewis Kelly, a member of the staff of the Director of Securities who had participated in a meeting between Edwin Schaeffer, an attorney from the Kincaid firm, and Dr. Ronda Paul, the Director of Securities. The memorandum stated: "Brought to office by E. Schaeffer 8/17/83. Met w/Ronda and me. Ronda advised him there would be no other requirements. File away. Ronda will consider it Rule 506 offering." [19] Casares argues that the district court should not have admitted the memorandum into evidence because it is hearsay and was not authenticated. Casares' hearsay argument ignores the public records exception to the hearsay rule, Fed. R.Evid. 803(8), which includes memoranda like the one at issue in this case. Casares provides no support for his suggestion that the memorandum is not a public record, and therefore we have no reason to overturn the admission of the memorandum on hearsay grounds. With respect to Casares' argument that the note was not authenticated, Casares did not so object at trial and, as a result, has waived his objection.

Casares' second argument—that any exemption granted by Dr. Paul was outside the scope of her authority—relies on 808 Ky.Admin.Regs. 10:150 (1982), a regulation that relates to § 292.410. Casares contends, first, that the regulation limits the granting of an exemption under § 292.410(1)(q) to transactions where certain criteria are met, and, second, that the defendants failed to meet these criteria.

■ Casares' argument depends on his assumption that the § 292.410(1)(q) exemption is available only if the regulations are satisfied. It appears, however, that the § 292.410(1)(q) is not so limited. As the district court noted in ruling for the defendants on this claim, there are two published no-action letters issued by the Kentucky Division of Securities that grant an exemption to transactions that do not meet all of the requirements of the regulations. *See Re: Coal Technologies Corp.,* Sec.Op. (Ky. Dep't of Banking Sec. Nov. 18, 1983) (registration exemption valid despite technical violation of regulations); *Re: John E. Shriver & Co., P.S.C.,* Sec. Op. (Ky. Dep't of Banking and Sec. Jan 7, 1985) (same). These letters indicate that the regulations do not exhaust the discretion of the Director of Securities and thus support the district court's conclusion that the § 292.410(1)(q) exemption was valid, irrespective of its compliance with Regulation 10:150. Casares is able to cite no authority for his interpretation that the regulations provide the exclusive route to exemption. In light of the no-action letters and Casares' failure

---

**18.** Only plaintiff Casares brought claims under the Kentucky blue sky laws.

**19.** Rule 506 is a part of Regulation D, which implements the Securities Act of 1933 with respect to the offer and sale of securities without registration. Under Rule 506, certain offers and sales are deemed to be exempt under Section 4(2) of the Securities Act.

to produce any countervailing authority, we conclude that the judge did not err in ruling that the Spendthrift offering was validly exempted from compliance with Kentucky's registration requirements.

## B. *The Jury Instruction*

Casares challenges the district court's inclusion of reliance and loss causation as elements in his claim under the Kentucky Blue sky laws, Ky.Rev.Stat.Ann. §§ 292.-320, 292.480 (Michie Bobbs–Merrill 1990), and he also appeals the court's formulation of the measure of damages.[20]

■ With respect to damages, Casares argues that the court incorrectly limited damages to the purchase price of the stock, because the instruction should have also included interest and attorneys' fees. The problem with this argument is that Casares' proposed jury instruction did not include either interest or attorneys' fees, and Casares apparently never objected to this aspect of the jury instruction at trial. Thus, he has not preserved his claim regarding the measure of damages.

■ Casares' second challenge to the jury instruction is that it improperly included reliance and loss causation as elements of a claim under the Kentucky blue sky laws. We have difficulty in determining whether Kentucky requires reliance because there are no reported cases that rule on this issue, and the only two relevant cases contain conflicting dicta. *Compare Carothers v. Rice*, 633 F.2d 7, 14 (6th Cir. 1980) (Kentucky's blue sky law "[does not] require proof of reliance upon the misrepresentation"), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981) *with*

*City of Owensboro v. First U.S. Corp.*, 534 S.W.2d 789, 791 (Ky.1975) (Kentucky blue sky law affords "the remedy available to a purchaser *induced by misrepresentation* to buy securities") (emphasis added). The lack of guidance is more severe with respect to loss causation: There are no reported cases that indicate whether or not loss causation is an element of a claim under the Kentucky Blue sky laws.

Under these circumstances, we are forced to rely on other authority in order to determine what Kentucky law requires. In our opinion, we should look to the elements of Rule 10b–5 claims, because, first, the section that imposes liability, Ky.Rev.Stat. Ann. § 292.320, is derived from and almost identical to Rule 10b–5, and, second, § 292.-530 states that "[t]his chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation." Almost every court that has construed Rule 10b–5 has found that reliance and loss causation are elements of a Rule 10b–5 claim. *See* 5C Arnold S. Jacobs, *Litigation and Practice Under Rule 10b–5* § 64.01(a) n. 2.1 and accompanying text (1991) (citing cases requiring reliance); *id.*, § 64.02 n. 9 and accompanying text (1991) citing cases requiring loss causation). In light of the consistent application of both reliance and loss causation requirements, and in light of the similarity of Rule 10b–5 to § 292.320, we conclude that the district court correctly instructed the jury that reliance and loss causation are elements of a claim under the Kentucky blue sky laws.[21]

---

**20.** Casares also alleges that the district court improperly included scienter as an element, but this claim misconstrues the jury instruction. The district court did not include scienter in its jury instruction on the Kentucky Blue sky claims.

**21.** Casares also brought a claim against the Kincaid firm, Central Bank, Bateman Eichler and Bryant under § 292.480(2), which provides that employees and agents of sellers are liable "with and to the same extent as the seller" if there has

been a violation of Kentucky's Blue sky laws. This section does not provide an independent basis for liability of employees and agents, but places the employees and agents in the same position as the seller. Because we affirm the district court's ruling regarding registration, and because we hold that the jury's verdict in favor of the defendants on the misrepresentation claim was not tainted by an incorrect instruction, there is no basis for any recovery under this section.

## SETTLEMENT FUND CLAIMS

An ancillary claim that was consolidated with the present action involved Central Bank and plaintiff Casares' law firm, Alagia, Day, Marshall, Mintmire & Chauvin ("Alagia"). Each of them claims a priority lien on plaintiff Casares' portion of a settlement fund.

## BACKGROUND

To finance his purchase of 100,000 shares of Spendthrift stock in 1983, Casares borrowed $750,000 from Central Bank, and pledged the stock as collateral. Central Bank perfected its interest by possession. Ky.Rev.Stat.Ann. § 355.9–305 (Michie Bobbs–Merrill 1990). Casares failed to pay any of the principal or interest due to Central Bank on the loan, and Central Bank brought suit in Kentucky state court.

In 1986, Casares entered into a written attorneys' fee agreement with Alagia for representation in matters arising from the Spendthrift private placement. Casares subsequently filed the current action against Brownell and Leslie Combs, Richard Broadbent (who performed the horse appraisal for the PPM), Central Bank and the other defendants in the instant case. Central Bank counterclaimed for the loan and related costs.

In August 1988, Leslie Combs and Richard Broadbent moved the court to accept a settlement agreement. Leslie Combs agreed to pay $2 million and Broadbent agreed to pay $100,000 (collectively, "Settlement Funds"), conditioned upon a release of all claims and, with respect to Combs, trial court approval and entry of an order barring contribution claims. The settlement agreements did not provide for a rescission of the stock purchase.

In December 1988, the district court entered summary judgment dismissing all

claims against Central Bank. The district court also granted summary judgment to Central Bank on its counterclaim, finding that Casares had breached his loan contract. The judgment stated that Casares owed Central Bank $750,000 principal and $337,474.25 accrued interest, post-judgment interest, attorneys' fees and costs.[22] Casares did not appeal this judgment and has not paid Central Bank.

Subsequently, Central Bank filed declarations in support of its application to attach Casares' portion of the Settlement Funds and for a temporary protective order preventing distribution of Casares' portion of the Settlement Funds. Central Bank contended that the Settlement Funds were "proceeds" from the disposition of its collateral, and that its security interest accordingly attached to the Funds. *See* Ky. Rev.Stat. § 355.9–306(2) (Michie Bobbs–Merrill 1990). The next day, the court issued a temporary protective order.

Shortly thereafter, the district court approved Leslie Combs' settlement. The court later ruled that the Settlement Funds were proceeds from the disposition of Central Bank's collateral, stating that, "[t]he Settlement Funds here, I think, reflected compensation for the lost value, perhaps the total loss of the Spendthrift stock...." The court thus held that "Casares' share of those settlements constitutes proceeds of Casares' Spendthrift stock...." The court further ruled that Alagia's attorneys' lien was subordinate to the claim of Central Bank, a prior secured creditor whose rights were vested. On October 24, 1989, the trial court filed a final judgment sustaining Central Bank's attachment.

## ANALYSIS

Alagia asserts—and Central Bank does not dispute on this appeal[23]—that Alagia has an attorney's lien on the Settlement

---

22. The district court subsequently ordered Casares to pay an additional $218,895.83 to Central Bank for attorneys' fees and costs.

23. Central Bank disputed the validity of the attorney's lien in the district court, but the court did not rule on Central Bank's arguments because of its holding that Central Bank had priority.

828

Funds. Both parties also agree that Central Bank obtained a perfected security interest in Casares' Spendthrift *stock* in 1983. The controverted issue is whether or not Central Bank has a security interest in the *Settlement Funds* that has priority over Alagia's lien.

Central Bank argues—and the district court held—that the Settlement Funds constitute "proceeds" from disposition of the stock, and that its collateral interest in the stock accordingly transfers to Casares' portion of the Funds. *See* Ky.Rev.Stat.Ann. § 355.9–306(2) (security interest "continues in any identifiable proceeds including collections received by the debtor").

The relevant provision of the Kentucky Commercial Code, Ky.Rev.Stat.Ann. § 355.9–306(1) states: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral...." Alagia argues that there has been no "sale, exchange, collection or other disposition of collateral," and that the terms of the statute therefore have not been met. If the purpose of the statute is to be served, however, the security-holder must be protected against diminutions in the value of the security that arise not only from sale, but also from other events or transactions that damage the security. The classic situation is that of a tort recovery obtained by a debtor for damage to secured property; the secured creditor obtains a lien on such a payment to replace the diminished value of the security. *See In re Stone*, 52 B.R. 305 (Bankr.W.D.Ky. 1985); *In re Territo*, 32 B.R. 377 (Bankr. E.D.N.Y.1983). There has been no sale, and no alteration in ownership, but in a broad sense there has been a "disposition" of which the tort recovery represents the "proceeds."

Furthermore, "[t]he obvious intent of [Ky.Rev.Stat.Ann. § 355.9–306(1) is to give the term 'proceeds' the broadest possible definition." *Stone*, 52 B.R. at 307. Thus we have interpreted a similar clause broadly to apply to a subsidy payment to a farmer for retiring land from cultivation; we held the payment to be "proceeds" of his crop for the benefit of a creditor who held a security on future crops. *In re Munger*, 495 F.2d 511 (9th Cir.1974).

In our view, the same principle protects Central Bank in the present case. Casares borrowed from the Bank to purchase Spendthrift stock, and surrendered the stock as security. Then, with the aid of the Alagia firm, he sued Leslie Combs and Richard Broadbent for misrepresentations that, Casares claimed, caused losses in the form of greatly decreased value of the stock. The locus of that loss was in the secured stock, and Central Bank as security holder is entitled to its lien on the settlement payments that were intended to compensate for that lost value. To view the settlement as other than "proceeds" of the stock would defeat the purposes of the Kentucky statute.

Alagia argues that the settlement did not damage the security. That argument misses the point; a settlement in this kind of a situation never damages the security. The damage, if any, comes from the activity that gave rise to the claim that was settled. Casares' claim, as we have said, was bottomed on the loss represented by the diminution in value of the Spendthrift stock.

Alagia emphasizes, however, that Leslie Combs was simply the private seller of the stock, not the issuer. Leslie Combs could have been liable to Casares for injuries that did not cause a diminution in the value of the stock. While this argument is theoretically correct, we do not believe that it accords with the practicalities of Casares' lawsuit against Leslie Combs. The suit would not have been brought if the stock had not declined in value. It was that decline that was asserted as the injury, and it was that decline for which the settlement compensated.[24] The settlement, therefore,

24. The fact that plaintiffs failed to establish such loss causation in their litigation against the non-settling defendants does not alter the nature of the settlement between plaintiffs and Leslie Combs and Broadbent.

constituted "proceeds" within the meaning of Ky.Rev.Stat.Ann. § 355.9–306(1).

Because the Settlement Funds constitute proceeds, Central Bank retains a security interest in them. *Id.*, § 355.9–306(2). The question that remains is whether Central Bank's security interest in the Settlement Funds has priority over Alagia's attorney's lien. This determination is not governed by the Kentucky Commercial Code, which expressly excludes from its application liens for services. We must look, therefore, to applicable case law.[25]

■ Although the Kentucky courts have not decided a priority dispute between an attorney's lien and a security interest, a number of courts have considered this issue and reached the same conclusion: A perfected security interest that is prior in time is superior to a later lien. *See, e.g., Williams v. Dow Chemical Co.*, 415 N.W.2d 20, 26 (Minn.Ct.App.1987); *Warner v. Tarver*, 158 Mich.App. 593, 405 N.W.2d 109, 112 (1986); *Effective Communications West, Inc. v. Board of Cooperative Educational Services*, 84 A.D.2d 941, 446 N.Y.S.2d 684, 685 (1981). We believe that Kentucky would follow this widely accepted rule.

■ As Alagia acknowledges, Central Bank perfected its security interest in the Spendthrift stock in 1983, more than two years before Alagia began providing legal services to Casares. Because the security interest was perfected by possession (which continues to the present day), and because the security interest in the stock includes the proceeds of the stock,[26] we conclude that Central Bank's security interest in the Settlement Funds was prior in time and is superior to Alagia's lien.

■ Alagia puts forward one other argument, however, that merits consideration: Alagia asserts that Kentucky courts have given priority to attorney's liens when the attorney, without the aid of the secured creditor, recovers a damage award for the debtor. The particular analogy that Alagia presents is that of worker's compensation. In Kentucky, an employer who pays compensation benefits to an injured employee is entitled to recover the compensation benefits and damages arising from the same injury paid to the employee by third parties. The Kentucky courts modified this rule (and their position has since been codified in Kentucky statutes) by holding that an attorney's lien has precedence over an employer with respect to a recovery from a third party. "[I]f the employee's counsel actually bears the burden of obtaining recovery from the third party, then whoever takes the money is chargeable with a share of the fee." *Stacy v. Nobel*, 361 S.W.2d 285, 288 (Ky.1962); *see also Charles Seligman Distributing Co. v. Brown*, 360 S.W.2d 509, 510 (Ky.1962). The courts reasoned that, because the funds were created by the attorneys, it would be inequitable for them to recover nothing.

Alagia contends that its position is analogous to that of the employee in the worker's compensation context, in that it pursued the money that now comprises the Settlement Funds without any assistance from Central Bank (and, in fact, over Central Bank's opposition to the settlements). The situations, however, are not analogous. In the worker's compensation cases, the Kentucky courts attempted to prevent employers from acting as "free riders" who stand on the sidelines while their employees sue third parties and who then reap all the benefits. In the instant case, however,

---

**25.** Ky.Rev.Stat.Ann. § 355.9–104 (Michie Bobbs–Merrill 1990) states that it "does not apply ... (3) To a lien given by statute or other rule of law for services or materials," unless the lien is possessory. As was noted in 8 William P. Hawkland, Richard A. Lord & Charles L. Lewis, Uniform Commercial Code Series 199 (1990), "priority disputes between holders of nonpossessory artisan's liens (whether given by statute or by the common law) and secured parties are to be resolved outside of Article 9."

**26.** Alagia argues on this appeal that Central Bank did not perfect its security interest in the proceeds of the Spendthrift stock. Alagia did not present this argument to the district court, however, nor has it suggested any reason for its failure to do so. Thus, this issue is not properly before this court on appeal. *Alexopulos by Alexopulos v. Riles*, 784 F.2d 1408, 1411 (9th Cir. 1986).

Central Bank was a defendant, along with Leslie Combs and Richard Broadbent. It did not choose to stand idly while a third party was sued, but instead was itself a subject of the suit. Thus the "free rider" analogy does not apply.

While there are equities on both sides of this issue, we conclude that Central Bank, by virtue of Ky.Rev.Stat. § 355.9–306, has the better claim. We therefore affirm the ruling of the district court.

## CONCLUSION

We find no reversible error in any of the rulings of the trial judge with respect to all of the matters discussed above. The judgments of the district court are

AFFIRMED.