189 F.3d 1017 (9th Cir. 1999)
 THE AMBASSADOR HOTEL COMPANY, LTD. a Taiwan Corporation, Plaintiff-counter-defendant Appellee,
v.
WEI-CHUAN INVESTMENT, Defendant, and JAU H. HUANG, HUEI SHYONG HUANG, SIMON SHEN, WEI-CHUAN CONSTRUCTION & DEVELOPMENT, INC., Defendants-counter-claimants counter-defendants-Appellants,
v.
KOPIN INTERNATIONAL, INC., Defendant-counter-claimant-Appellee.
 97-56423
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 14, 1999--Pasadena, California
Decided August 31, 1999
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Robert A. Olson and Laura Boudreau, Greines, Martin, Stein & Richland, Beverly Hills, California, for the defendants-counter-claimants-counter-defendants-appellants.
 
 
 3
 Patrick K. Huang and Judith M. Mitchell, Huang & Mitchell, Los Angeles, California, for plaintiff-counter-defendant-appellee Ambassador Hotel Co., Ltd., and counter-defendantcounter-claimant-appellee Kopin International, Inc.
 
 
 4
 Appeal from the United States District Court for the Central District of California; Robert M. Takasugi, District Judge, Presiding. D.C. No. CV-90-06626-RMT.
 
 
 5
 Before: Diarmuid F. O'Scannlain and A. Wallace Tashima, Circuit Judges, and Edward C. Reed, Jr.,* District Judge.
 
 REED, District Judge:
 
 6
 Defendants Wei-Chuan Construction and Development, Inc. ("WCC"), Jau H. Huang, Huei Shyong Huang and Simon Shen appeal the judgment of the district court in favor of plaintiff Ambassador Hotel Co., Ltd. ("Ambassador") and counter-claimant Kopin International, Inc. ("Kopin") (together, "plaintiffs"). In the action below, Ambassador brought federal securities fraud, common-law fraud and breach of contract claims that arose from its decision to join a hotel venture proposed by the defendants, which failed. Defendants counterclaimed against Ambassador and added claims against Kopin, alleging that Kopin mismanaged the project. In turn, Kopin counterclaimed, asserting claims against defendants for fraud, breach of fiduciary duty, and breach of contract.
 
 
 7
 The district court found defendants liable for violations of the federal securities laws, fraud, breach of contract, and breach of fiduciary duty. Defendants argue that the evidence in the case does not support the judgment. Defendants also challenge the district court's award of damages toboth Ambassador and Kopin as double recovery for Ambassador based on Ambassador's ownership of Kopin stock. Finally, defendants challenge the district court's award of punitive damages to Ambassador. We have jurisdiction pursuant to 28 U.S.C. S 1291, and we affirm in part and reverse in part. We have filed contemporaneously with this opinion a memorandum disposition, which addresses those issues not resolved herein.
 
 FACTS
 
 8
 In 1985, brothers Jau Huang and Huei Huang formed Wei-Chuan Carson. The company purchased a vacant lot in Carson, California, for $2,025,000. The company then transferred the property to WCC.[1] In April, 1986, WCC obtained a $10 million construction loan, using the property as security. WCC then began construction of a hotel on the Carson property.
 
 
 9
 By the end of 1986, however, loan funds had been substantially depleted.[2] Lack of funds forced WCC to halt construction completely in the first quarter of 1988. WCC failed to make payments on the construction loan, and by April 15, 1988, the loan was delinquent. At this point, the structure was approximately sixty percent complete. In June, 1988, WCC, through its officers, asked Ambassador to become its partner in the hotel project.[3] Representatives from Ambassador visited the site that month. WCC agents told Ambassador representatives that the estimated cost of the hotel structure, or shell, was $16,600,000. WCC also provided its visitors with a brochure which detailed the items included in that price.
 
 
 10
 On June 17, 1988, WCC and Ambassador signed an agreement, or memorandum of understanding ("Summarized Minutes of Investment and Joint Venture Meeting"), which identified various changes and upgrades that would occur if Ambassador did sign on to the hotel project. The upgrades included the following items: (a) the addition of a Chinese restaurant; (b) several additions to the planned Japanese restaurant; (c) the creation of a "VIP" floor; and (d) the use of furnishings and amenities appropriate to a four-star hotel. During the meeting, when Ambassador representatives asked about the potential cost impact of the agreed-upon upgrades, WCC agents stated that the upgrades could be accommodated without problem. Jau Huang later told Michael Chang, Ambassador's General Manager, that the cost of the hotel shell was $16,600,000. Jau Huang also stated that the cost of fixtures and finishes would depend upon the quality of the equipment and furnishings used in the hotel.
 
 
 11
 On July 18, 1988, WCC representative Jeff Chen presented the project to Ambassador's board of directors in Taiwan. Jeff Chen also provided to the board a written investment report or prospectus, prepared by Jeff Chen, Jau Huang, and Huei Huang. The prospectus placed the total cost of the hotel project at $22 million.
 
 
 12
 Following Jeff Chen's presentation, on July 22, 1988, Ambassador and WCC signed an agreement to enter into a joint venture ("Memorandum"). Under the terms of the agreement, the two parties were to form a corporation, called Kopin International, Inc. The agreement fixed the share capital of the new corporation at $12 million. The $12 million capital contribution was to be funded by the parties: Ambassador was to contribute 60%, or $7.2 million, and WCC was to contribute 40%, or $4.8 million. The parties also agreed that Kopin would obtain an additional $10 million bank loan. Kopin was to use theloan proceeds and additional capital funds to pay for the completed hotel. Any increase of project costs above the $22 million budget figure would have to be approved by Kopin's Board of Directors.[4] Upon completion of the hotel shell, WCC was to convey it to Kopin for the actual cost of construction as determined by an independent audit, not to exceed $16.6 million. Kopin was to provide for furnishings, fixtures and equipment ("FF&E"). Finally, Kopin was to operate the hotel.
 
 
 13
 Some time after the parties signed the agreement, WCC informed Ambassador that Wei-Chuan Investment ("WCI") and Ho-Yu Investment Company would satisfy the financial obligation made to the project by WCC. WCI was to contribute $4.3 million and Ho-Yu Investment Company was to contribute $500,000.
 
 
 14
 Kopin was incorporated September 7, 1988. The Board of Directors named later that month included Michael Chang, as chairman of the board, Jau Huang, as vice chairman of the board, and Jeff Chen, as vice president and secretary. Soon after Kopin incorporated, Huei Huang left California for Taiwan; he had no further involvement with the hotel project. Simon Shen took over as project superintendent.
 
 
 15
 During that same month, interior designer Robert Hsueh completed an FF&E budget which took into account the proposed upgrades. The budget came to $7.2 million, $3 million more than the $4.2 million FF&E budget set forth in the investment prospectus presented to Ambassador and incorporated into the $22 million budget for Kopin. Apparently acting on instructions from Jau Huang, Robert Hsueh did not dis-close this $7.2 million figure when he presented his preliminary plans to Ambassador for its approval. After Ambassador transferred its first partial capital contribution into Kopin's account, Jau Huang informed Ambassador of the shortfall. The parties later agreed to increase Kopin's cash capital by $2 million; Ambassador was to invest an additional $1.2 million, and WCC was to invest an additional $0.8 million. Apparently, Ambassador agreed to the increase only because WCC had threatened to stop work on the hotel.
 
 
 16
 Ambassador later deposited in the Kopin account the full amount of its obligation to the project, including the additional $1.2 million. Thus, Ambassador contributed a total of $8.4 million to Kopin. Ho-Yu Investment Company contributed $0.5 million to Kopin and thereby satisfied its financial obligation in full. WCI, however, never fully satisfied its obligation; the District Court found the capital contribution made by WCI deficient by approximately $2.8 million. In addition, WCC never paid in the additional $0.8 million that was its share of the increased cash capital amount.
 
 
 17
 After the formation of Kopin, shell construction resumed. WCC began to incorporate changes made necessary by the upgrades agreed to by the parties. However, at this point the engineers and builders did not have updated architectural, mechanical or electrical plans from which to work. Builders worked from outdated plans and from interior design plans, which had not yet been coordinated with approved construction plans. In constructing the hotel, WCC deviated from structural plans to such an extent that in the end, serious structural defects threatened the safety of the building.
 
 
 18
 Because the construction loan had gone into default, WCC agreed to make scheduled deposits into an account monitored by bank loan officers. Jau Huang had signature authority on the Kopin bank account and used Kopin funds to make these required deposits. WCC then used funds in the monitored account to pay various construction expenses. In this way, Kopin paid for shell construction expenses on an ongoing basis. Jau Huang also paid some amounts to WCI from the Kopin account.Given this activity, the district court found that between October, 1988, and March, 1989, Jau Huang misappropriated approximately $3.9 million from the Kopin account.
 
 
 19
 In July, 1989, Michael Chang signed loan documents from Bank of California on Kopin's behalf. In executing the loan documents, Mr. Chang relied on the representations made to him by Jau Huang. Mr. Chang does not read or speak English well; he believed that Kopin had obtained a new loan to take out the construction loan previously obtained by WCC. Kopin would thus have paid $10 million toward the final purchase price of the completed hotel. However, Mr. Chang actually signed an assumption agreement whereby Kopin took over the $10 million construction loan, with the entire loan amount due and payable in six months.
 
 
 20
 Despite the fact that neither Ambassador nor Kopin had requested changes beyond what had been agreed to by the parties as of July, 1988, WCC charged Kopin for changes. WCC presented Kopin with a $1.3 million change order for prospective electrical, plumbing and air conditioning work. However, much of the work in question had been performed long before the change order date and did not involve changes made necessary by the upgrades. In addition, WCC charged Kopin, and Kopin paid for, approximately $1.9 million in shell construction costs which WCC identified as FF&E charges. In all, Jau Huang caused Kopin to pay the full cost of $16.6 million for the hotel shell, even though the project never reached completion.[5]
 
 
 21
 By November, 1989, Kopin had no remaining capital. TMSI Contractors, Inc., the construction management firm hired to assess the project, informed Kopin in April, 1990, that completion of the hotel according to existing plans would require an additional $6.5 million. TMSI Contractors, Inc. also told Kopin about the severe structural defects in the building. At this point, Ambassador decided not to invest any additional funds in the project; it advanced $500,000 to Kopin so that Kopin could attempt to salvage some value from the project. On October 5, 1990, Bank of California foreclosed on the construction loan and purchased the property at public sale.
 
 
 22
 Ambassador brought suit against Jau Huang, Huei Huang, Jeff Chen, WCC, and additional Wei-Chuan companies. Ambassador brought claims of federal securities fraud, state law fraud, and breach of contract. WCC, WCI, and Ho-Yu Investment Co. counterclaimed against Ambassador and brought third-party claims against Kopin and twelve individual parties, asserting state-law claims of negligence, breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, and slander. Kopin then counterclaimed against WCC, WCI, Wei-Chuan Carson, Jau Huang, Huei Huang, and Simon Shen, asserting state-law claims of fraud, breach of contract, breach of fiduciary duty, declaratory relief, and money had and received.
 
 
 23
 Following a two-month bench trial, the district court entered judgment in favor of Ambassador against WCC, Jau Huang, Huei Huang, and Jeff Chen, jointly and severally, in the amount of $8.9 million.[6] The district court also awarded Ambassador $10 million in punitive damages. The district court entered judgment in favor of Kopin against WCC, Jau Huang, and Simon Shen, jointly and severally, in the amount of $14 million.[7] Finally, the districtcourt ordered WCC, Jau Huang and Simon Shen to indemnify Kopin against the claims of various subcontractors and suppliers.
 
 STANDARD OF REVIEW
 
 24
 The district court's conclusions of law are reviewed de novo. Terran v. Kaplan, 109 F.3d 1428, 1432 (9th Cir. 1997); Magnuson v. Video Yesteryear, 85 F.3d 1424, 1427 (9th Cir. 1996). Mixed questions of law and fact also receive de novo review. United States v. Duarte-Higareda, 113 F.3d 1000, 1002 (9th Cir. 1997).
 
 
 25
 The district court's findings of fact following bench trial are reviewed for clear error. Fed. R. Civ. P. 52(a); Howard v. United States, 181 F.3d 1064, 1065 (9th Cir. 1999). Review under the clearly erroneous standard requires considerable deference; the findings of the district court should stand unless the appellate court has the "definite and firm conviction that a mistake has been committed." Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 623 (1993). The appellate court may not substitute its judgment for that of the district court. "If the [trial court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Phoenix Eng'g & Supply Inc. v. Universal Elec. Co. , 104 F.3d 1137, 1141 (9th Cir. 1997) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985)).
 
 
 26
 The district court's computation of damages following a bench trial is reviewed for clear error. Bartleson v. United States, 96 F.3d 1270, 1274 (9th Cir. 1996); Howard v. Crystal Cruises, Inc., 41 F.3d 527, 530 (9th Cir. 1994). However, the issue of whether the district court applied the correct legal standard in computing damages receives de novo review. Howard, 41 F.3d at 530; R. B. Matthews, Inc. v. Transamerica Trans. Servs., Inc., 945 F.2d 269, 272 (9th Cir. 1991).
 
 DISCUSSION
 A. Federal securities fraud
 
 27
 The district court found that WCC, Jau Huang and Huei Huang violated both Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), and Rule 10b-5, 17 C.F.R. S 240.10b-5. Section 10(b) provides:
 
 
 28
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 
 
 29
 . . .
 
 
 30
 (b) to employ, in connection with the purchase or sale of any security registered on a national securities exchange or any securities not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary and appropriate in the public interest or for the protection of investors.
 
 15 U.S.C. S 78j(b). Rule 10b-5 provides:
 
 31
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 32
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 33
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 34
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 35
 17 C.F.R. S 240.10b-5. Thus, to prove violation of either Section 10(b) or Rule 10b-5, the private plaintiff must demonstrate that the alleged fraud occurred "in connection with the purchase or sale of a security". Once this foundational requirement has been met, the plaintiff must prove five elements:
 
 
 36
 1. mis-representation (or omission, where there exists some duty to disclose);
 
 
 37
 2. materiality;
 
 
 38
 3. scienter (intent to defraud or deceive);
 
 4. reliance; and
 
 39
 5. causation.
 
 
 40
 McGonigle v. Combs, 968 F.2d 810, 817 (9th Cir. 1992). The plaintiff must prove both actual cause ("transaction causation") and proximate cause ("loss causation"). Id. at 820.
 
 
 41
 1. Fraud "in connection with" the purchase or sale of a security
 
 
 42
 Defendants argue that the alleged fraud against Ambassador did not occur in connection with the purchase or sale of a security. According to defendants, since the alleged fraud occurred with respect to the joint venture agreement, and since the joint venture agreement does not have the status of an investment contract, or security, the federal securities fraud claim must fail. However, as plaintiffs point out, Ambassador did transfer money to Kopin, the corporation it had agreed to form in partnership with WCC. Ambassador received Kopin stock in exchange for its investment. Moreover, the federal securities laws specifically define "security " to include stock[8]. Thus Ambassador clearly did engage in the "purchase or sale of any security." The critical question, then, becomes whether the alleged fraud occurred "in connection with " the purchase or sale of the securities in question.
 
 
 43
 Courts have not pinned down with any specificity the meaning of the requirement that fraud occur in connection with the purchase or sale of a security. In Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6 (1971), the Supreme Court found fraud in connection with the sale of securities where individuals used the proceeds from the sale of U.S. Treasury bonds to pay for the acquisition of all the stock of the corporation which had owned the bonds, thereby depriving the corporation of any proceeds from the sale of the bonds and stripping the corporation of significant assets. According to the Supreme Court, given the clear goals of Congress, "Section 10(b) must be read flexibly, not technically and restrictively." Id. at 11-12. Since the plaintiff corporation suffered injury "as a result of deceptive practices touching its sale of securities as an investor," Section 10(b) did provide for redress. Id. at 12-3.
 
 
 44
 This court found fraud in connection with the purchase of securities in a broker's misrepresentation of the risks of buying securities on margin in a declining market. In Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615 (9th Cir. 1981), the defendants argued that the alleged fraud occurred in connectionwith the method of financing the purchase of securities, rather than in connection with the purchase itself. Because the broker had misrepresented both the risks of buying on margin and the recommendations of Merrill Lynch analysts as to four specific stocks, this court held that the trial court properly found fraud in connection with the purchase of securities. See id. at 619.
 
 
 45
 In contrast, this court declined to find the necessary connection to the purchase or sale of a security in a case which involved an accounting firm's advice on how the plaintiff company could identify certain transactions in its financial statements.
 
 
 46
 [Defendant] rendered advice on the manner in which the corporation could account for its repurchase agreements after purchasing and selling [securities]. This advice had nothing to do with the intrinsic nature of the [securities], or with risks related to the method of their purchase, or, indeed, to any factor reasonably linked to their purchase and to plaintiffs' ultimate loss.
 
 
 47
 In re Financial Corp. of Am. Shareholder Litig. , 796 F.2d 1126, 1130 (9th Cir. 1986). According to the case law, then, the fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves. While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction.
 
 
 48
 The court should consider whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question. Id. See also Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1486 (9th Cir. 1991) ("[The] plaintiff must establish a connection between the defendant's alleged misrepresentation and the security at issue."). Deception related to the value or merit of the securities in question has sufficient connection to securities transactions to bring the fraud within the scope of S 10(b). SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993).
 
 
 49
 In the instant case, the district court found that defendants made material misrepresentations and omissions "in the course of their solicitation of Ambassador to purchase securities." Defendants argue that the solicitation in question concerned the joint venture agreement, in which the two parties committed only to the formation of the new corporation. The joint venture agreement does not mention stock. According to defendants, the fact that the newly-formed corporation later issued stock does not transform the signing of the memorandum agreement into the necessary securities transaction. The later issuance of stock has little or no relationship to the key interaction; that is, the commitment of the two parties to the new venture.
 
 
 50
 Defendants fail to acknowledge, however, that the misrepresentations and omissions did relate to the value of the Kopin stock. The misrepresentations and omissions concerned the costs involved in building the hotel as well as the status of the construction loan. By means of these misstatements, defendants implied that Kopin, the new corporation, would have some particular worth. Had defendants communicated the true facts, Ambassador board members would have received more accurate information about the value of Kopin's primary asset, the hotel, as well as the specific level of risk inherent in the investment. The misrepresentations made by defendants were misstatements about the value of the proposed investment as well as the risks involved; these matters go to the nature of the securities at issue. Moreover, Ambassador did show the important causal connection between the alleged misrepresentations and its purchase of securities: the evidence at trial demonstrated that had it not been for defendants' misrepresentations, Ambassador would not have invested in Kopin stock. Thus, the foundational requirement has been met;the defendants engaged in fraud in connection with the purchase or sale of a security.
 
 2. Loss causation
 
 51
 The private plaintiff asserting claims for federal securities fraud must prove causation; namely, the causal connection between defendant's misrepresentation and plaintiff's injury. Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988). The causation requirement can be broken down into two necessary elements: actual cause, or transaction causation; and proximate cause, or loss causation. [I]n an action brought under Rule 10b-5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm.
 
 
 52
 Hatrock v. Edward D. Jones & Co., 750 F.2d 767, 773 (9th Cir. 1984). Congress recently made the loss causation element an explicit requirement in private federal securities fraud actions:
 
 
 53
 In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.
 
 
 54
 15 U.S.C. S 78u-4(b)(4). To prove transaction causation, the plaintiff must show that but for the fraud, the plaintiff would not have engaged in the transaction at issue. To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff.
 
 
 55
 The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.
 
 
 56
 Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981) (cited with approval in McGonigle v. Combs, 968 F.2d 810, 821 (9th Cir. 1992)), aff'd in part and rev'd in part on other grounds, 459 U.S. 375 (1983). That is, the misrepresentation or omission must relate to that which caused the investment to lose value. Thus, the loss causation requirement limits the ability of plaintiffs to recover for losses sustained on the basis of factors unrelated to any misrepresentation or fraud.
 
 
 57
 In this case, the district court found defendants' misrepresentations and omissions to have been the actual and proximate cause of Ambassador's injury. On appeal, defendants argue that the evidence presented at trial did not prove loss causation. Defendants challenge the conclusion of the district court on two grounds. First, defendants contend that Ambassador chose not to put any more money into the project and allowed the bank to foreclose on the property based on the structural defects found in the hotel shell. Because the district court did not find any material misrepresentation with respect to the structural defects, defendants conclude, the loss to Ambassador must not have occurred as a result of any misrepresentation. Second, defendants argue that an economic downturn in the hotel market doomed the hotel project before its inception. Since the hotel would not have proved viable under any circumstances, defendants argue, the award of damages to Ambassador provides Ambassador with an undeserved windfall.
 
 
 58
 Defendants' first argument rests on their own characterization of Ambassador's reasons for abandoning the hotel project. According to defendants, the structural defects in the hotel shell were the reason that Ambassador decided not to invest any more funds in the project. However, this explanation fails to take into account important aspects of the decision.Ambassador decided not to pursue the hotel project further because the structural defects meant that completion of the hotel would have cost an additional $6.5 million. Defendants had represented to Ambassador that the total cost of the project would not exceed $22 million. Also, defendants had represented that shell construction would not cost more than $16.6 million. Had each of those representations been accurate, and had other representations by defendants been accurate, Ambassador would not have been faced with the prospect of having to invest additional millions in construction of the hotel in order to salvage the project. Whether or not defendants deliberately concealed the structural defects, by the time Ambassador dropped the project, the project costs substantially exceeded the cost of the investment as presented by defendants. In order to realize the benefits of the investment it had been persuaded to make, Ambassador would have had to invest far more than the amount for which it had originally bargained.
 
 
 59
 Clearly, too, the fact that defendants did not disclose the delinquent status of the construction loan directly related to Ambassador's injury. According to evidence introduced at trial, had Ambassador known about the status of the construction loan, it would have required defendants to cure the default before it signed on to the project. Had the default been cured, Bank of California would not have foreclosed on the property. Alternatively, had the facts been as defendants portrayed them by omitting any mention of the default, no foreclosure would have occurred.
 
 
 60
 Defendants next put forward the theory that had the hotel been completed, it would have failed in operation. Defendants emphasize the drop in hotel occupancy rates in southern California that occurred around the time of the project's failure. Also, defendants claim that at trial, experts on both sides of the case agreed that the hotel project would not have proved viable. Essentially, defendants argue that had the foreclosure never occurred, adverse market forces eventually would have produced the same result. As appellees point out, however, defendants cannot prove conclusively that Ambassador would have suffered the same loss; at most, defendants argue probabilities. Such claims do not provide an adequate ground on which to overturn the district court's finding of proximate cause. To establish that the deceptive practices in this case were not the proximate cause of Ambassador's injury, defendants would have to show that Ambassador suffered the loss of its investment because of the adverse market conditions.
 
 
 61
 Primarily, defendants rely on the claim that even if all the facts had been as they represented the facts to Ambassador, Ambassador would still have suffered the same loss, because the hotel would not have made enough money for Ambassador to satisfy its debt obligations. In fact, some securities fraud cases do state that if the plaintiff would have lost its investment despite any misrepresentation by the defendant, plaintiff has failed to prove loss causation. See, e.g., Bastian v. Petren Resources Corp., 892 F.2d 680 (7th Cir. 1990). Defendants correctly identify the central question posed in Bastian and other cases: would the plaintiff have suffered the loss in question even if the misrepresentations had been accurate? However, the idea that the plaintiff would have lost the investment in any case may refer to alternate causes for the loss, or it may refer to future events. The analysis of proximate cause asks for an interpretation of events that did occur, not the speculative assessment of events that might otherwise have taken place.
 
 
 62
 The cases cited by defendants support the conclusion that in order to defeat loss causation in this case, the market decline must have been an intervening direct cause of the harm suffered by plaintiffs. "[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)(emphasis added). True, the decline in investment value caused by events unrelated to any fraud cannot serve as the basis for fraud liability, but the decline in value must have been caused by those other events. "[T]here is no liability . . . when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition. " Citibank, N.A.v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992) (emphasis added). Defendants also rely on Bastian. In that case, the court found no loss causation where an unexpected drop in oil prices rendered the plaintiffs' investment in limited partnerships worthless. Again, though, the market decline caused the drop in investment value. Not one court in the cases cited by defendants examined what might have happened in the future had the loss not occurred. Rather, in each case, the court considered factors which contributed to or caused the loss in question.
 
 
 63
 By arguing what might have been, defendants seriously distort general principles of causation. Questions of proximate cause arise when more than one factor can be identified as the cause of any particular event, or harm. However, to have been the cause (or one cause) of a particular event, any given factor must have contributed to the actual outcome; events which occur after the injury has occurred cannot be said to have caused the injury. To put it another way, a wrong cannot be the proximate cause of harm if it was not an actual cause of that harm. Therefore, any argument that the hotel project would have failed down the line, given market conditions, must be regarded as irrelevant. Defendants' only possible argument must be that the market decline, rather than the foreclosure, was the proximate cause of the injury to Ambassador.
 
 
 64
 Market conditions would be relevant to the proximate cause analysis if the market decline had caused the value of the Kopin stock to fall while the hotel itself was still under construction, prior to the foreclosure. However, defendants do not make this argument. Defendants did not contend at trial and do not argue on appeal that the market downturn in question caused Kopin stock to decline in value before Bank of California foreclosed on the property.
 
 
 65
 Defendants do allege that unfavorable market conditions made the hotel project "infeasible" at the time of foreclosure. Such an allegation of infeasibility does not go to the question of the value of the Kopin stock, however. In addition, defendants assert that adverse market conditions "necessarily and inevitably destroyed the project's value." However, the evidence submitted by defendants does not demonstrate that the market decline destroyed the project's value. Most of the evidence introduced by defendants at trial related to market conditions during the years following the foreclosure. Defendants did present some evidence of declining occupancy rates beginning in 1990, the year Bank of California foreclosed, but made no connection between the decline in occupancy rates and the value of the Kopin stock. Evidence of conditions in the Southern California hotel market after the foreclosure cannot serve to prove that the value of the hotel project declined prior to the foreclosure. Furthermore, defendants provided no evidence to support any claim that the value of the Kopin stock had declined as a result of adverse market conditions occurring prior to the foreclosure.
 
 
 66
 To demonstrate loss causation, Ambassador did not have to prove that the hotel project would have succeeded if the misrepresentations made by defendants had been accurate; Ambassador had to prove only that the deception practiced by defendants caused its injury, in the sense that no other factor could more properly be said to have been the legal cause. At trial, Ambassador showed the requisite causal link between the misrepresentations andomissions made by defendants and the loss of its investment in the hotel project. Since defendants did not provide any evidence that adverse market conditions were an intervening direct cause of the harm suffered by Ambassador, the district court did not err in finding that defendants' misrepresentations and omissions proximately caused the harm.
 
 B. Damages
 1. Ambassador
 
 67
 a. Compensatory damages
 
 
 68
 Defendants argue that the district court improperly awarded Ambassador double recovery, in that Ambassador received in damages the full measure of its lost investment in the project and also retained its stock in Kopin, which received the separate award of $14 million. We agree.
 
 
 69
 Section 28(a) of the Securities Exchange Act of 1934 provides, in relevant part:
 
 
 70
 [T]he rights and remedies provided by this chapter [15 U.S.C. S 78a et seq.] shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.
 
 
 71
 15 U.S.C. S 78bb(a). In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), the Supreme Court "clearly interpreted S 28(a) as governing the measure of damages that are permissible under S 10(b)." Randall v. Loftsgaarden, 478 U.S. 647, 663 (1986). Neither section 10(b) nor Rule 10b-5 sets forth any more specific measure of damages.
 
 
 72
 The usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss; that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received. Consequential damages may also be awarded if proved with sufficient certainty. DCD Programs v. Leighton, 90 F.3d 1442, 1449 (9th Cir. 1996).
 
 
 73
 The general rule allows plaintiffs defrauded in violation of section 10(b) and Rule 10b-5 to recover the difference between the value of the consideration they gave and the value of the security they received, plus consequential damages that can be proved with reasonable certainty to have resulted from the fraud.
 
 
 74
 Arrington, 651 F.2d at 621. The district court may apply a rescissory measure of damages in appropriate circumstances.DCD Programs, 90 F.3d at 1449; Arrington, 651 F.2d at 621; Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975).
 
 
 75
 In the proceedings below, the district court applied a modified out-of-pocket measure. Ambassador paid $8.4 million for its shares of Kopin stock. The district court valued the Kopin stock at zero, measured at the time of the discovery of the fraud, or the time Ambassador learned of the structural defects in the hotel shell. Consequently, the court arrived at an out-of-pocket figure of $8.4 million. The court then added consequential damages of $0.5 million, because Ambassador spent that amount in an attempt to mitigate the harm it suffered. Thus, the court awarded Ambassador $8.9 million in compensatory damages.
 
 
 76
 However, the district court erred. The Kopin stock did not have zero value at the time the fraud was discovered. At that time, defendants had already siphoned off millions from the Kopin bank account and had fraudulently caused Kopin to sign the loan assumption, making Kopin liable for the entire $10 million loan, due and payable within six months. Thus, at that time, Kopin had valid legal claims against defendants. These un-adjudicated claims were corporate assets; un-adjudicated claims held by a corporation are among its assets and may materially affect the value of the corporation's stock. See, e.g., Affiliated Ute Citizens, 406 U.S. at 154-56.Thus, the district court erred in setting the value of the Kopin stock at zero.
 
 
 77
 Alternatively, the award to Ambassador can be seen as an award under the rescissory measure of damages. Rescission reverses the fraudulent transaction and returns the parties to the position they occupied prior to the fraud. It restores the status quo ante. Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest. See Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring); see generally D. Dobbs, Law of Remedies S 9.3(3) (2d ed. 1993). If true rescission is no longer possible (perhaps because the plaintiff no longer owns the subject of the sale), the court may order its monetary equivalent. This remedy entitles the plaintiff to the return of the consideration paid less any value received on the investment. Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1413 (9th Cir. 1987).
 
 
 78
 In this case, under the district court's order, Ambassador was awarded damages equivalent to its full investment in Kopin, but was also allowed to keep the Kopin stock. Ambassador was not required to tender the stock or otherwise account for the benefit it received. This result violates the principle of rescission. Ambassador may not receive the full purchase price of the stock and also retain the stock itself. The stock now has considerable value, since the district court has awarded Kopin judgment on its claims against defendants.
 
 
 79
 True recission is not available in this case, since it would require the dissolution of Kopin. Also, it would not be appropriate to order that Ambassador turn the Kopin stock back to WCC, since WCC did not sell the stock to Ambassador. In turn, it would not be appropriate to require Ambassador to tender the stock to Kopin; if that occurred, WCC would own all outstanding Kopin stock, which does have somevalue, and thus WCC would benefit from its own wrongdoing. Therefore, the monetary equivalent of rescission should be awarded if the district court opts to proceed under this theory of relief. Ambassador should not be required to give up its Kopin stock. However, under the rescissory measure, the damage award to Ambassador must be offset by the value of the Kopin stock, including any money judgment awarded to Kopin in this case.
 
 
 80
 Under either measure of damages, the $8.9 million damage award overcompensates Ambassador. Therefore, the compensatory damage award should be vacated.
 
 
 81
 b. Punitive damages and prejudgment interest
 
 
 82
 Punitive damages may not be awarded for the violation of federal securities law. See 15 U.S.C. S 78bb(a). However, California Civil Code section 3294 authorizes an award of punitive damages in an action for breach of an obligation not arising from contract, where the defendant has been found guilty of fraud, oppression or malice. Cal. Civ. Code S 3294(a). California Civil Code section 3288 authorizes the award of prejudgment interest in an action for the breach of an obligation not arising from contract, and in every case of fraud, oppression or malice. Cal. Civ. Code S 3288; Alliance Mortgage Co. v. Rothwell, 10 Cal. 4th 1226, 1241 (1995). Both punitive damages and prejudgment interest may be awarded on successful fraud claims. Alliance, 10 Cal. 4th at 1241; Vogelsang v. Wolpert, 227 Cal.App.2d 102, 125 (1964).
 
 
 83
 Since punitive damages may be awarded only in tort, defendants claim the district court erred by awarding Ambassador both punitive damages and prejudgment interest calculated at the contract rate. Under established law, the prevailing plaintiff may not recover tort damages and contract damages for thesame wrong, even though the plaintiff might have set forth alternate theories of recovery. Shell v. Schmidt, 126 Cal. App. 2d 279, 291 (Ct. App. 1954). Moreover, the plaintiff may not receive multiple awards for the same item of damage. "Regardless of the nature or number of legal theories advanced by the plaintiff, [he or she] is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence." Tavaglione v. Billings, 4 Cal. 4th 1150, 1158-59 (1993). See also Burgess v. Premier Corp., 727 F.2d 826, 837 (9th Cir. 1984) (holding that although district court found for plaintiff on number of different federal and state law claims, plaintiff was entitled to only one recovery for its one loss). Therefore, where the plaintiff has suffered only one loss, only one measure of damages may be awarded.
 
 
 84
 On appeal, defendants contend that Ambassador received damages in tort (punitive damages) and damages in contract (the 10 percent contract interest rate) for the same alleged wrong, the fraudulent inducement of the agreement. In fact, the district court also found that defendants breached the agreement in question. Ambassador did suffer two separate harms. Still, Ambassador suffered only one loss, the loss of its investment, and therefore could not have received separate compensatory damage awards for its fraud claim and for its contract claim. Since Ambassador could not have received separate damage awards for its single loss, the district court erred by awarding both punitive damages, which sound in tort, and the higher interest rate, which sounds in contract.
 
 2. Kopin
 
 85
 Defendants argue that the district court erred by awarding Kopin more in damages than Kopin lost through its investment in the hotel project. The district court awarded Kopin $14 million for the loss of the entire project. However, as defendants correctly point out, Kopin could not have lost $14 million on the project, since Kopin had never been fully capitalized at that amount[9].
 
 
 86
 In common-law fraud cases, courts apply one of two different measures of damages: out-of-pocket damages or benefit-of-the-bargain damages.
 
 
 87
 The benefit-of-the-bargain [measure] awards the difference between the actual value of the property received and the value it would have had were it in the state represented. However, under the out-of-pocket approach the defrauded party receives only the difference between the value of the property received and the amount [that party] paid.
 
 
 88
 Kenly v. Ukegawa, 16 Cal. App. 4th 49, 53 n.2 (Ct. App. 1993). Usually, out-of-pocket damages are calculated as of the time of the transaction, while benefit-of-the-bargain damages are calculated as of the date of the discovery of the fraud. Salahutdin v. Valley of Cal., Inc., 24 Cal. App. 4th 555, 568 (Ct. App. 1994).
 
 
 89
 Where either standard might apply, California ordinarily applies the out-of-pocket standard. Alliance , Cal. 4th at 1240 (1995). The California Legislature has specifically provided that the victim of fraud in the sale, purchase or exchange of property may recover only out-of-pocket losses plus certain additional damages; benefit-of-the-bargain damages may not be awarded. Cal. Civ. Code S 3343. However, this provision does not apply where the person who committed the fraud owed fiduciary duties to the victim. Under these circumstances, the broader damage provisions of section 1709 and section 3333 apply. Alliance, 10 Cal. 4th at 1241; Gray v. Don Miller & Assocs., Inc., 35 Cal. 3d 498, 504 (1984);Stout v. Turney, 22 Cal. 3d 718, 725-26 (1978); Liodas v. Sahadi, 19 Cal. 3d 278, 283-84 (1977); Pepitone v. Russo, 64 Cal. App. 3d 685, 689 (Ct. App. 1976). Under section 1709, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. CodeS 1709. Similarly, section 3333 provides: "For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Cal. Civ. Code S 3333. Thus, in an action involving fraud by a fiduciary of the defrauded party, the defrauded party should be awarded damages for all loss proximately caused by the fraud.
 
 
 90
 In this case, Kopin paid $16.6 million for the unfinished hotel shell ($6.6 million cash plus the assumption of the $10 million construction loan). Subsequently, Kopin lost the property through foreclosure. The district court determined that the hotel shell transaction involved fraud by the defendants. The district court also found that as an officer anddirector of Kopin, Jau Huang owed the corporation fiduciary duties. Therefore, Kopin should be compensated for any and all losses proximately caused by the fraud.
 
 
 91
 In setting the amount of damages awarded to Kopin, the district court applied the benefit-of-the-bargain measure of damages. The district court relied on Pepitone v. Russo, 64 Cal. App. 3d 685 (1976). In that case, the plaintiff sued her real estate broker for breach of fiduciary duty in connection with her acquisition of a motel. The broker had not disclosed that the second deed of trust on the property contained an acceleration clause, and as a result of the application of the acceleration clause, the plaintiff lost the property through foreclosure. The appellate court fixed the amount of damages by calculating the loss sustained by the plaintiff due to the foreclosure; it did not restrict plaintiff to the difference between the price plaintiff paid for the motel and the value of the motel at the time of the transaction. Id. at 689. The court found that the loss to the plaintiff was the difference between the total purchase price of the motel and the encumbrances on the property--or, in other words, what the plaintiff had paid, including the assumption of certain loans, less the amount of the loans which were extinguished upon foreclosure. Id. In this case, the district court used the same measure of damages, but it used the $24 million figure as the total purchase price for the property in question. Kopin paid $16.6 million for the property ($6.6 million cash plus the assumption of the $10 million construction loan), not $24 million. Therefore, the district court erred in setting the damage award for Kopin at $14 million ($24 million less the $10 million encumbrance). The loss figure for the transaction involving the hotel shell should be $6.6 million ($16.6 million less the $10 million encumbrance).
 
 
 92
 In addition, though, upon foreclosure and as a result of the fraud committed by the defendants, Kopin lost everything else it had invested in the project as well; for example, payments it had made for legitimate FF&E items. Kopin had been capitalized at $10.4 million. It paid out that entire sum through the course of the project, either in transfers to the Wei-Chuan Carson construction account or in direct payments to suppliers and subcontractors. Kopin should be awarded damages for all losses proximately caused by the fraud; this sum should include all that Kopin had invested in the project which it lost as a result of the foreclosure. Therefore, Kopin should be awarded $10.4 million in damages[10].
 
 
 93
 The judgment as to liability is AFFIRMED. The damage awards are VACATED, and the case is REMANDED for further proceedings consistent with this opinion and the corresponding memorandum disposition issued herewith.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior United States DistrictJudge for the District of Nevada, sitting by designation.
 
 
 [1]
 Jau Huang and Huei Huang were shareholders, directors, and officers of WCC: Jau Huang served as president, and Huei Huang served as vice-president.
 
 
 [2]
 Apparently, WCC used $2 million of the construction loan to pay off the outstanding debt on the land.
 
 
 [3]
 Lieh-Ho Huang, father of Jau and Huei Huang, was on the Ambassador board of directors, and had a close relationship with the now-deceased chairman of the board.
 
 
 [4]
 Ambassador had the right to name six directors to the Kopin board and WCC had the right to name five.
 
 
 [5]
 This figure represents $6.6 million in cash payments over time, plus Kopin's assumption of the $10 million construction loan.
 
 
 [6]
 Judgment by default was entered against Jeff Chen; he is not a party to this appeal. Also, all additional parties named in the suit but not found liable by the district court are not parties to this appeal.
 
 
 [7]
 The district court originally awarded Kopin $24 million in damages; however, the court later reduced this amount upon defendants' motion to reflect the fact that liability on the $10 million construction loan had been extinguished through foreclosure.
 
 
 [8]
 The Securities Exchange Act defines "security" as follows, in relevant part: The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profitsharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any interest or instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . . . 15 U.S.C. S 78c(a)(10).
 
 
 [9]
 Kopin was never fully capitalized. WCI failed to contribute its full share of the original investment amount, and WCC never contributed its share of the additional $2 million the parties later agreed to invest. In reality, Kopin was capitalized at $10.4 million.
 
 
 [10]
 Kopin should not receive any damages for the shortfall in the initial capitalization of the company. Neither WCC, nor Jau Huang, nor Simon Shen had an obligation to Kopin with respect to any capital contribution. Rather, the capital contribution formed part of the agreement between WCC and Ambassador.