259 F.3d 1036 (9th Cir. 2001)
 CALIFORNIA IRONWORKERS FIELD PENSION TRUST, A JOINTLY TRUSTEED MANAGEMENT LABOR TRUST FUND; CALIFORNIA AND VICINITY FIELD IRONWORKERS ANNUITY TRUST, A JOINTLY TRUSTEED MANAGEMENT LABOR TRUST FUND; CALIFORNIA IRONWORKERS FIELD WELFARE PLAN; RICHARD ZAMPA, MICHAEL NEWINGTON; THOMAS J. BERNSEN; JIM BUTNER; JAMES MURPHY; JAMES PRUETT; JOE ROTH; JOE STANDLEY; ELWOOD TWEET; GENE VICK; GLENN BUSTRUM; JOHN EVERHART; RICHARD HOERTIG; CHARLES KREBS; NICK LEE; STEPHEN P. LYONS; JOHN WARE; DAVE MCEUEN, IN THEIR CAPACITIES AS TRUSTEES OF EACH OF THE AFORESAID TRUST FUNDS, PLAINTIFFS-APPELLANTS-CROSS-APPELLEES
v.
LOOMIS SAYLES & COMPANY, A LIMITED PARTNERSHIP; LOOMIS SAYLES & COMPANY, INC., A CORPORATION, DEFENDANTS-APPELLEES-CROSS-APPELLANTS
 Nos. 99-56520, 99-56522
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 7, 2001
Filed August 6, 2001
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Counsel: James P. Watson, Stanton, Kay & Watson, Llp, San Francisco, California; Michael B. Roger, Christian L. Raisner, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, California; and Joseph A. Creitz, Law Offices of Joseph A. Creitz, Walnut Creek, California, for the plaintiffs-appellants-cross-appellees.
 
 
 3
 Sandra Tichenor, Loomis, Sayles & Co., Llp, San Francisco, California; and Paul J. Ondrasik, Jr., John R. Labovitz, Eric G. Serron, Steptoe & Johnson, Llp, Washington, D.C., for the defendants-appellees-cross-appellants.
 
 
 4
 Appeal from the United States District Court for the Central District of California Christina A. Snyder, District Judge, Presiding D.C. No. CV-96-4036-CAS
 
 
 5
 Before: Alex Kozinski and Richard C. Tallman, Circuit Judges, and Jeremy Fogel, District Judge[1]
 
 Opinion by Judge Fogel
 
 6
 Before the Court are an appeal and cross-appeal from a final judgment in an ERISA[2] action in which three employee benefit trust funds (collectively the "Trusts") and their Trustees sued investment managers for breach of fiduciary duties and related claims. Following a bench trial, the district court found that the investment managers, Loomis Sayles & Company, LLP and Loomis Sayles & Company, Inc. (collectively "Loomis"), had breached duties owed to the California Field Ironworkers Health and Welfare Trust Fund ("Welfare Trust") but had not breached duties owed to the California Field Ironworkers Annuity Trust Fund ("Annuity Trust") or the California Field Ironworkers Pension Trust Fund ("Pension Trust"). The district court entered judgment in the amount of $1,107,213 based upon its findings in favor of the Welfare Trust, but declined to award attorney's fees or costs to either side.
 
 
 7
 We have jurisdiction and affirm the district court's findings regarding liability and its decision not to award attorney's fees or costs. However, we vacate the judgment and remand for recalculation of damages.
 
 BACKGROUND
 
 8
 The parties agree that the Trusts are employee benefit plans within the meaning of ERISA and that Loomis' management of Trust funds was governed both by ERISA and by the Trusts' investment guidelines. Each Trust's investment guidelines required that investment managers inform the Trustees of significant changes in investment strategy, adhere to the "prudence" rule, maintain sufficient liquidity to meet current cash needs, and obey the instructions of the Trustees. Each set of guidelines also contained lists of assets appropriate and inappropriate for investment, which differed slightly with respect to each Trust.
 
 
 9
 In 1992, 1993 and 1994, Loomis purchased "inverse floaters" on behalf of all three Trusts. A floater is a type of collateralized mortgage obligation ("CMO"), that is, a security backed directly or indirectly by real estate mortgages. Unlike a common floater, an inverse floater's rate of return moves inversely to market rates, rising when the rate index falls and falling when the rate index rises. When purchased at or below face value ("par") from an appropriate entity, inverse floaters have little credit risk because the investor is likely to recover the entire principal if the securities are held until the date of maturity. However, like the rate of return, the maturation period of inverse floaters is highly sensitive to changes in interest rates. When interest rates decline, the mortgages backing the investment are paid off more quickly by refinancing homeowners, thus shortening the maturation period. When interest rates rise, the mortgages are paid off more slowly, thus extending the maturation period.
 
 
 10
 None of the Trusts' guidelines explicitly prohibited investment in CMOs or, more specifically, in inverse floaters. Loomis reported its purchases of inverse floaters to John Ebey, an outside consultant hired by the Trusts to monitor fund investments. Ebey never suggested to Loomis or to the Trustees that investment in inverse floaters was inappropriate.
 
 
 11
 In February 1995 the Trustees hired a new outside consultant, Alan Biller. At that time interest rates, which had begun rising in 1994, were fairly high, thereby depressing the price of inverse floaters. Their price was further depressed by the 1994 failure of Askin Capital Management, an investment company which had purchased large quantities of inverse floaters with borrowed funds.
 
 
 12
 After reviewing the Trusts' portfolios, Biller concluded that inverse floaters were highly risky and recommended that the Trustees order the immediate sale of all inverse floaters. Biller also recommended that the Trustees amend each Trust's guidelines to prohibit any future investment in inverse floaters. Though Biller was aware that the immediate sale of the inverse floaters would result in a significant loss of principal because of the depressed market price, he apparently did not consider the alternative of holding them until interest rates came down (thus raising the market price of inverse floaters) or until the date of maturity, even though the Trusts had no immediate need for additional liquidity.
 
 
 13
 The Trusts, acting on Biller's advice, directed Loomis to sell all inverse floaters immediately. Loomis did so, and the sale resulted in a loss of approximately $23 million. It is undisputed that the value of inverse floaters began increasing shortly after the sale and that had they been retained the Trusts would have experienced a gain on their investments in those securities.
 
 
 14
 The Trusts and the Trustees filed suit against Loomis in June 1996, asserting breach of fiduciary duties and related claims. Following a twelve-day bench trial, the district court found the following: The Trusts' guidelines did not expressly prohibit investment in inverse floaters; the decision to invest in inverse floaters was within Loomis' discretion; Loomis adequately researched inverse floaters before investing; Loomis did not violate fiduciary duties with respect to the Annuity and Pension Trusts; and Loomis did not breach its duty of loyalty with respect to any of the Trusts.
 
 
 15
 The district court concluded, however, that investment of thirty percent of the Welfare Trust's assets in inverse floaters violated the prudence rule, and it therefore found a breach of fiduciary duty with respect to the Welfare Trust, awarding damages in the amount of $1,107,213. The district court denied the Trusts' request that Loomis be required to disgorge the fees paid by the Trusts and also denied the Welfare Trust's request for attorney's fees and costs.
 
 STANDARD OF REVIEW
 
 16
 We review de novo a district court's conclusions of law. See Star v. West, 237 F.3d 1036, 1038 (9th Cir. 2001). A district court's determinations regarding mixed questions of law and fact generally are reviewed de novo as well. See id. However, the factual findings underlying such determinations are reviewed for clear error. See id.
 
 
 17
 We review for clear error a district court's computation of damages following a bench trial. See Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment, 189 F.3d 1017, 1024 (9th Cir. 1999). However, we review de novo the issue of whether the district court applied the correct legal standard in computing damages. See id.
 
 
 18
 We review for abuse of discretion a district court's decision whether to award attorney's fees and costs under ERISA. See Plumber, Steamfitter and Shipfitter Indus. Pension Plan & Trust v. Siemens Bldg Techs., Inc., 228 F.3d 964, 971 (9th Cir. 2000); Williams v. Caterpillar, Inc., 944 F.2d 658, 667 (9th Cir. 1991).
 
 DISCUSSION
 I. Liability
 
 19
 The Trusts contend that the district court erred in failing to find that Loomis breached duties owed to all three Trusts. Loomis contends that the district court erred in finding that Loomis breached fiduciary duties owed to the Welfare Trust.
 
 A. Investment Guidelines
 
 20
 Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA. See 29 U.S.C. §§ 1102(a)(1); 29 C.F.R. §§ 2509.94-2(2). Although we have not addressed the issue, at least one other circuit has held that failure to follow written statements of investment policy constitutes a breach of fiduciary duty. See Dardaganis v. Grace Capital, Inc., 889 F.2d 1237, 1241-42 (2d Cir. 1989).
 
 
 21
 The Trusts contend that the district court erred in finding that Loomis did not violate guidelines requiring Loomis to notify the Trusts of significant changes in investment strategy and to seek clarification if the guidelines were unclear. While the district court did not make explicit factual findings regarding these precise issues, it did state that the guidelines permitted investment in CMOs and that Loomis had no obligation to disclose to the Trusts the particular risks inherent in inverse floaters before purchasing them. Implicit in these statements is a factual finding that Loomis did not violate the guidelines' notification requirements. This factual finding is not clearly erroneous because it is supported by evidence in the record, including the text of the guidelines themselves and the opinion of Loomis' expert, who testified that investment in inverse floaters did not represent a significant change in Loomis' investment strategy.
 
 
 22
 The Trusts also contend that the district court erred in failing to find a breach of fiduciary duties arising out of Loomis' asserted failure to comply with the conservative"spirit" of the guidelines. We are unaware of any authority indicating that a failure to comply with the "spirit" of written investment guidelines constitutes a breach of the duties imposed by §§ 1102(a)(1) when the actual terms of the written guidelines have been followed. Accordingly, we conclude that the district court did not err in failing to find a breach of fiduciary duty arising from the asserted violation of the"spirit" of the guidelines.
 
 B. Prudence Rule
 
 23
 An investment manager of a trust governed by ERISA must discharge his or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man [sic] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §§ 1104(a)(1)(B). This requirement is referred to as the prudence rule. When applying the prudence rule, the primary question is whether the fiduciaries, "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).
 
 
 24
 The prudence rule also requires that a fiduciary give appropriate consideration to the role a proposed investment plays in a portfolio as a whole or, where appropriate, that portion of the portfolio as to which the fiduciary has investment duties. See 29 C.F.R. §§ 2550.404a-1(b)(1)."Appropriate consideration" includes:
 
 
 25
 (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and
 
 
 26
 (ii) Consideration of the following factors as they relate to such portion of the portfolio:
 
 
 27
 (A) The composition of the portfolio with regard to diversification;
 
 
 28
 (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
 
 
 29
 (C) The projected return of the portfolio relative to the funding objectives of the plan.
 
 
 30
 29 C.F.R. §§ 2550.404a-1(b)(2).
 
 
 31
 Applying these standards, the district court determined that Loomis adequately investigated the inverse floaters before purchase and gave appropriate consideration to the role the inverse floaters would play in the portfolios of the Annuity and Pension Trusts. However, the district court concluded that because Loomis did not give appropriate consideration to the role the inverse floaters would play in the portfolio of the Welfare Trust, it thus ran afoul of the prudence rule with respect to that Trust.
 
 
 32
 The Trusts contend that the district court erred in concluding that Loomis adequately investigated the inverse floaters and gave appropriate consideration to the particular needs of the Annuity and Pension Trusts. Loomis contends that the district court erred in concluding that Loomis failed to give appropriate consideration to the particular needs of the Welfare Trust.
 
 
 33
 Rahim Manji, the Loomis portfolio manager assigned to the Trusts' investments, used the Bloomberg financial analysis system to assess the potential investments in inverse floaters. The Trusts argued at trial that the Bloomberg system was inadequate and presented expert testimony that option adjusted spread ("OAS") analysis was the only appropriate method of investigation, but the district court found more persuasive Loomis' evidence that the Bloomberg system was the tool prevalently used in the industry and that only a few portfolio managers were using OAS analysis, and it made factual findings to that effect. On the basis of these findings, the district court concluded that Loomis acted prudently with respect to its investigation of the potential investments. The district court's factual findings regarding industry standards were not clearly erroneous,[3] and thus it did not err in concluding that Loomis acted prudently with respect to its investigative obligations.
 
 
 34
 The Trusts also argued at trial that Manji did not consider the specific needs and characteristics of the individual Trusts prior to investing in inverse floaters, presenting expert opinion and other evidence to this effect. However, Manji testified that he read and considered each Trust's guidelines, targeted each Trust's investments to exceed its respective benchmark and considered each Trust's cash-flow needs. Loomis also introduced expert testimony that the percentage of assets allocated to inverse floaters was appropriate for each Trust, taking into consideration the characteristics of each Trust's portfolio as a whole.
 
 
 35
 The district court was persuaded by Loomis' evidence with respect to the Annuity and Pension Trusts but concluded that Manji did not give appropriate consideration to the particular needs of the Welfare Trust. Specifically, the district court found that "the investment of thirty per cent of the Welfare Trust assets in the interest-rate sensitive inverse floaters of lengthy duration violated the overall conservatism of the Welfare Trust guidelines, notwithstanding that these were the only guidelines that expressly authorized investment in CMOs." The district court went on to find that
 
 
 36
 "[b]ased on, among other things, the more conservative nature of the Welfare Trust's investment goals, the relatively higher percentage of that Trust's assets that were invested in inverse floater [sic], and the fact that the Welfare Trust performed below its benchmark, the degree of investment of Trust assets in inverse floaters was imprudent for that Trust."
 
 
 37
 We see no need to disturb the district court's findings or conclusions as to whether Loomis violated the prudence rule. With respect to the Annuity and Pension Trusts, there is ample evidence in the record to support the district court's conclusion that Loomis adequately considered the needs of those Trusts before investing in inverse floaters. With respect to the Welfare Trust, the district court's ruling was based not upon a determination that Manji failed to consider the needs of the Welfare Trust at all, but rather upon its determination that Manji imprudently invested too much of the Welfare Trust's assets in inverse floaters. We find no fault with the district court's analysis given evidence that inverse floaters could be highly risky investments, that the Welfare Trust had very conservative investment guidelines and that nearly one third of the Welfare Trust's total assets were invested in inverse floaters as opposed to the much smaller percentages of Annuity and Pension Trust assets (approximately seven percent and five percent, respectively) invested in inverse floaters.
 
 C. Duty To Disclose
 
 38
 ERISA imposes upon fiduciaries a general duty to disclose facts material to investment issues. See Barker v. American Mobil Power Corp., 64 F.3d 1397, 1403 (9th Cir. 1995) (holding that "[a] fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information"). Loomis contends that ERISA's general duty of disclosure is limited to information relating to the provision of benefits or the defrayment of expenses, citing Hughes Salaried Retirees Action Committee v. Administrator of Hughes Non-Bargaining Retirement Plan, 72 F.3d 686, 693 (9th Cir. 1995) (en banc). Although the language of Hughes arguably limits the broader language of Barker , it is not clear that this result was intended. Hughes involved a request by participants for specific information; the decision does not address Barker or its statements regarding the existence of a general duty to disclose facts material to investment issues.
 
 
 39
 However, we need not resolve this potential conflict in order to decide the present case because, even applying the broader articulation set forth in Barker, the district court did not err in concluding that Loomis did not breach the duty to disclose. The Trusts asserted at trial that Loomis failed to disclose a number of material facts, including the decision to purchase inverse floaters and Loomis' practice of manually pricing inverse floaters. The district court did not make explicit findings regarding all of the asserted facts, but it clearly concluded that none of the asserted facts was sufficiently material to trigger the duty to disclose. We agree. Moreover, Loomis did disclose many of the facts at issue to Ebey, the consultant hired by the Trustees to monitor the investments. Finally, we note that none of the Trustees testified at trial, and as a result there was no evidence presented that they would have refused to allow investment in inverse floaters had they been informed of the facts in question.
 
 D. Duty Of Loyalty
 
 40
 Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the exclusive purpose of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. §§ 1104(a)(1)(A).
 
 
 41
 The Trusts argued at trial that Loomis breached the duty of loyalty by engaging in a scheme of nondisclosure regarding material information. Loomis argued that it disclosed all material information. The district court's explicit conclusion that Loomis did not breach the duty of loyalty is supported by evidence in the record that Loomis disclosed all material information. As is discussed above, no other information triggered any disclosure obligation.
 
 II. Damages
 
 42
 A fiduciary who breaches duties with respect to an ERISA plan "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §§ 1109(a).
 
 
 43
 The district court calculated damages to the Welfare Trust by measuring "the difference between the Welfare Trust's actual performance and what its performance would have been had its funds been invested in fixed income assets of the permitted types described in the Welfare Trust Plan in the same proportion in which they were actually invested during the time period in question, plus prejudgment interest on said amount." Relying upon the benchmark yield as an approximation of what the improperly invested funds would have earned if properly invested, the district court concluded that the Trusts were damaged in the amount of $1,107,213.[4]
 
 
 44
 We review de novo the issue of whether the district court applied the correct legal standard in computing damages. See Ambassador Hotel, 189 F.3d at 1024.
 
 
 45
 Loomis challenges the district court's methodology, noting that the finding of imprudence was based upon the degree to which the Welfare Trust's assets were invested in inverse floaters, not upon the fact that assets were invested in inverse floaters at all. Indeed, the district court stated explicitly that "[t]he liability for imprudence in managing the Welfare Trust was not based on the mere fact of investment in inverse floaters, but rather the degree of investment in inverse floaters." Loomis argues that the district court therefore should have awarded damages flowing only from that portion of assets invested in inverse floaters which exceeded the amount it would have been appropriate to invest in inverse floaters.[5]
 
 
 46
 While we have not previously addressed the issue of the appropriate measure of damages when the breach of fiduciary duty arises from the degree rather than the mere fact of investment in a particular security, the Restatement (Third) of Trusts is instructive in this regard:
 
 
 47
 If a breach of trust consists only in investing too large an amount in a single security or type of security, the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest.
 
 
 48
 Restatement (Third) of Trusts, §§ 205, cmt. f. The common law of trusts is incorporated into analysis of ERISA claims unless inconsistent with the statute's language, structure or purpose. See Harris Trust and Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 250 (2000). Moreover, the measure of damages set forth in the Restatement is based upon sound reasoning. It would be both illogical and unjust to require a fiduciary to pay damages resulting from the entire amount of an investment when only a portion of the investment was imprudent.
 
 
 49
 While no other circuit has adopted the above-quoted portion of the Restatement per se, at least one circuit court has applied a similar approach. In GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 895 F.2d 729 (11th Cir. 1990), the court concluded that investment of seventy percent of the portfolio's assets in long-term treasuries was imprudent, but that investment of thirty-five percent of assets in long-term treasuries would have been acceptable. The court measured the damages by calculating the difference in yields between the actual portfolio and a hypothetical portfolio containing thirty-five percent long-term treasuries. See id. at 733.
 
 
 50
 We adopt the Restatement's permissible percentage standard for calculation of damages. Because the district court did not articulate a permissible percentage of investment in inverse floaters for the Welfare Trust in making its determination of damages, we vacate the judgment and remand for recalculation of damages applying the permissible percentage standard.
 
 
 51
 Loomis also argues that the district court erred in using the Welfare Trust's benchmark yield to approximate the yield which would have resulted if the assets allocated to inverse floaters had been invested appropriately. To a large extent, this argument is mooted by our decision to adopt the permissible percentage standard. However, to the extent that the district court may wish to rely upon the benchmark yield in its recalculation of damages, such reliance would be appropriate. It would be extremely difficult to arrive at even an approximate calculation of the yields which reasonably could have been expected from different portions of the portfolio assuming appropriate investment. When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered. See Sutton v. Earles, 26 F.3d 903, 918 (9th Cir. 1994).
 
 
 52
 Finally, the district court properly rejected Loomis' argument that losses attributable to the investment in inverse floaters should be offsets by gains in excess of the benchmark which are attributable to other portions of the Welfare Trust portfolio. Section 213 of the Restatement (Third) of Trusts addresses situations in which losses may be balanced against profits. This section, which the district court referred to as the "anti-netting rule," states as follows:
 
 
 53
 A trustee who is liable for a loss caused by a breach of trust may not reduce the amount of the liability by deducting the amount of a profit that accrued through another and distinct breach of trust; but if the breaches of trust are not separate and distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom.
 
 
 54
 Restatement (Third) of Trusts, §§ 213. In other words, a fiduciary is liable for the total aggregate loss of all breaches of trust and may reduce liability for the net loss of multiple breaches only when such multiple breaches are so related that they do not constitute separate and distinct breaches. Notwithstanding the possibility that a fiduciary may be permitted to balance losses and gains attributable to multiple breaches of trust, the comments to §§ 213 make clear that a fiduciary may not balance losses attributable to a breach of trust against gains attributable to actions which do not involve a breach of trust. Id., cmt. c.
 
 
 55
 We have not previously addressed the appropriate application of §§ 213. However, at least one other circuit has adopted the approach set forth in comment c, noting that even if losses attributable to the breach are more than balanced by gains resulting from appropriate investments, the plan beneficiaries are entitled to "the greater profits the Plan might have earned if the Trustees had invested in other Plan assets" rather than the impermissible assets. Donovan v. Bierwirth, 754 F.2d 1049, 1054 (2d Cir. 1985). We join the Second Circuit in adopting this approach.
 
 III. Attorney's Fees And Costs
 
 56
 ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. §§ 1132(g)(1). In general, a court considering whether to award attorney's fees and costs under ERISA must consider five factors: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees would deter others from breaching duties under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. See Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir. 1980); see also Landwehr v. DuPree, 72 F.3d 726, 739 n.5 (9th Cir. 1995).
 
 
 57
 The Trusts contend that the district court erred in failing to award attorney's fees and costs based upon its finding of liability against Loomis. We conclude that the district court appropriately considered the Hummell factors and did not abuse its discretion in declining to award attorney's fees and costs. Pointing to the absence of any breach of the duty of loyalty or other wilful misconduct, the district court concluded that Loomis did not act in bad faith. The district court further found that Loomis did not breach the majority of the duties asserted by the Trusts and that the one duty breached the duty to invest prudently was breached only as to the degree of assets invested in inverse floaters. As a result, the district court found that both parties' positions had merit and concluded that these factors, weighing against an award of fees and costs, outweighed the fact that its judgment in the case would benefit all plan participants.
 
 
 58
 The district court did not expressly consider whether Loomis had the ability to pay a fee award, but the parties agree that this was not a significant factor because Loomis is a financially secure company which never has asserted an inability to pay fees. The district court did not expressly consider whether a fee award would deter future wrongful conduct. However, because the breach in this case comprised an error in judgment regarding the degree of assets which properly could be allocated to inverse floaters, rather than an affirmative act of misconduct, it is questionable whether an award of fees would act as a deterrent. The district court's judgment as to fees therefore was not an abuse of discretion.[6]
 
 
 59
 We affirm the decision of the district court denying the award of attorney's fees and costs to either side.
 
 
 60
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Jeremy Fogel, United States District Judge for the Northern District of California, sitting by designation.
 
 
 [2]
 Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq.
 
 
 [3]
 On appeal, the Trusts argue that the district court erroneously believed the relevant "industry" to be all investment analysts, including analysts working on retail accounts. While the Trusts contend that the relevant "industry" should be limited to those investment analysts acting as ERISA fiduciaries, they cite no authority for this proposition.
 
 
 [4]
 $889,779 plus prejudgment interest in the amount of $217,434.
 
 
 [5]
 Loomis did not raise this argument before the district court. However, because we review de novo the question of whether the district court applied the correct legal standard in calculating damages, we nonetheless consider whether the standard now proposed by Loomis is the correct legal standard.
 
 
 [6]
 The Trusts argue on appeal that the district court should have considered an additional factor, namely, the fact that the Trusts' attorneys' fees far exceeded the damages award. While this fact may cause the Trusts' victory to ring hollow, we are unprepared to hold that an ERISA plaintiff is entitled to recover attorneys' fees simply because the plaintiff spent more on fees than was awarded in the judgment.